## THE STATE OF KANSAS v. HENRY MOWRY.

| | |
|---|---|
| 37 | 369 |
| 39 | 598 |
| 37 | 369 |
| 40 | 262 |
| 37 | 369 |
| 44 | 575 |
| 37 | 369 |
| 48 | 427 |
| 37 | 369 |
| 51 | 678 |
| 37 | 369 |
| 73 | 320 |
| 37 | 369 |
| f77 | 742 |
| 37 | 369 |
| f79 | 536 |
| f79 | 537 |

1. MURDER; *Insanity; Proper Instruction.* The defendant interposed the defense of insanity to the charge of murder in the first degree, and on the trial the court charged substantially that the test of the defendant's responsibility was, whether at the time of the homicide he had capacity and reason sufficient to enable him to distinguish between right and wrong, as to the particular act he was doing, and had power to know that the act was wrong and criminal, and would subject him to punishment. *Held,* That it was a proper instruction; *and further held,* that the omission to charge that if the defendant knew the act to be wrong, but was driven to it by an irresistible impulse arising from an insane delusion, he would not be responsible, was not error.

2. VOLUNTARY INTOXICATION, *No Excuse for Crime; When Considered.* Voluntary intoxication is no excuse for crime, and can only be considered in cases involving the condition of the defendant's mind when the act was done. On a charge of murder the drunkenness of the defendant may be considered with a view of determining whether there was that deliberation, premeditation, and intent to kill, necessary to constitute the offense.

3. FELONY; *Arrest by Private Person; Murder.* A private person may, in a temperate manner and without a warrant, arrest one who has just committed a felony; and it is murder for the person so attempted

24 — 37 KAS.

to be arrested to kill one whom he knows is in fresh pursuit and endeavoring to arrest him for such felony‚

4. ———— *Authority to Arrest; Notice of Crime.* Where a person has been apprehended in the commission of a felony, or in fresh pursuit, notice of the crime and the purpose of pursuit, by one endeavoring to arrest him for such crime, is not necessary.

5. OFFENSE—*Inferior Degree—Instructions.* Instructions upon an offense inferior in degree and included in the one charged should not be given, unless there is some evidence tending to show that the defendant is guilty of such offense.

6. ———— The verdict held to be sustained by the evidence.

### *Appeal from Cowley District Court.*

PROSECUTION for murder in the first degree. The defendant, *Henry Mowry*, was charged with the unlawful, willful, deliberate and premeditated killing of James P. Smith, in Cowley county, Kansas, on the 21st day of August, 1885. Trial at the April Term, 1886, of the district court, and conviction of the crime as charged. The defense interposed was insanity and self-defense. New trial denied; judgment in accordance with the verdict. The defendant appeals. The opinion contains a sufficient statement of the facts.

*Jennings & Troup,* and *W. E. Stanley,* for appellant; *Irwin Taylor,* of counsel.

*C. L. Swarts,* county attorney, for The State; *Henry Asp,* of counsel.

The opinion of the court was delivered by

JOHNSTON, J.: At the April term, 1886, of the district court of Cowley county, Henry Mowry was prosecuted and convicted for the murder of James P. Smith. He seeks a reversal on the alleged insufficiency of the evidence and supposed errors in charging the jury. It is conceded that he shot and killed Smith on the afternoon of April 21, 1886; but he defended on the ground that he was insane and irresponsible. There is testimony that in December, 1884, he began boarding at the house of O. F. Godfrey, his partner in business, whose

family consisted of himself, his wife and two children. While boarding there he became enamored with Mrs. Godfrey, and frequently declared his love for her. She listened to his protestations of love for some time without informing her husband; but later she discouraged his attentions, and requested him to remain away from the house. He then became moody and morose, and declared that it was more than he could bear to be separated from her. About this time he had an interview with his mother, who testified that he was then in great distress of mind because of the cold treatment received from Mrs. Godfrey. He declared his affection for her, stating that she encouraged his attentions at first, and that he had had illicit connection with her, and was the father of her infant child, but that now she repulsed him, and he begged his mother to intercede with Mrs. Godfrey to allow him to continue his visits at her house. On the morning of August 21, 1885, the day that Smith was killed, he called on Mrs. Godfrey and again begged her to renew her former relations with him, but she refused, and stated that she would inform Mr. Godfrey of his. conduct toward her. He then asked if anything occurred by which she should be without home, friends, or money, she would call upon him; and inquired if she would marry him in case anything should happen to Mr. Godfrey. She told him she would not, and he said, "That settles it; we can't be friends any longer," and left the house. Later in the day he returned to the house and found Mrs. Godfrey alone, when he demanded to know whether she intended to tell Mr. Godfrey upon him as she had threatened to do. She informed him that she would, and he replied that he would just as soon shoot her, and he thought he would do it before night. He had a shotgun with him, and during the parley pointed it at her. She ordered him to leave the house, saying that she would call her son Frank and send him for her husband, and she followed him out of the house and did call her son and directed him to go and bring his father. After leaving the house he met Mr. Godfrey and informed him that he had had trouble with his wife, and that she had a story to tell him; to

go down to the house and hear it; and he asked him if he would promise to come back and hear his side of the story. This was agreed to by Mr. Godfrey, who immediately went to the house and had an interview with his wife, and returned to the hotel, where he again met Mowry. Mowry inquired if Mrs. Godfrey had told her story, and Mr. Godfrey replied that she had, and informed him that he could not come to the house again. Mowry then insisted that he should listen to his story, stating to Godfrey that the youngest child was his, and that he was going to have it; that he would spend every dollar he had on earth, but that he would ruin the family or have that child. Godfrey left him at once and returned to his home, and had been there but a short time when he discovered Mowry coming towards the house with a shotgun in his hand. Godfrey immediately took his gun and went to the front door, and as Mowry started through the gate towards the house he ordered him to go. Mowry said, "I don't have to," and stepped back into the street. At this time Mrs. Godfrey ran in front of her husband, who pushed her aside, and Mowry then raised his gun and fired two shots through a window in that part of the house to which Mrs. Godfrey had been pushed. Mrs. Godfrey ran and called some workmen, who were engaged upon a building near by, for help. Mowry immediately started away from the house, reloading his gun as he went. He was pursued by a large number of persons who were in the vicinity. Smith, the deceased, was in the lead of those in pursuit of Mowry, and gained on him as they ran. When Smith came up within about fifteen feet, Mowry turned with his gun and ordered Smith to halt, which he momentarily did. Mowry ran on again, followed by Smith, when he turned, brought his gun up, and halted Smith a second time. There was only a brief halt, for Mowry made another dash to escape, but was still pursued by Smith, who was closing in on him, when Mowry turned and a third time ordered him to stop, and almost at the same time fired at Smith, discharging a load of shot into his face and neck. Some one near by came up where Smith fell, and the only words he was heard to utter

were, "Catch that man;" and he died within a few minutes after he was shot. Mowry was pursued until he was captured, but not until he had shot another of his pursuers. There is testimony that after his capture he stated that he shot at Mrs. Godfrey, and supposed he had killed her; and further, when told that he had killed Smith, he said that he was sorry he shot him; that he had told him three times to stop and he would not do it, when he shot him, and that he would do the same thing again.

It is insisted by counsel for the appellant, that his conduct toward Mrs. Godfrey, and his acts immediately before and after the homicide, are evidence of insanity. They offered testimony tending to show that about the time of the homicide he acted differently from what he had before, in this, that he was moody and morose, restless at night, and absent-minded in the daytime, complaining of pain in his head, and on several occasions becoming excited, when he would yell, cry, laugh and sob by turns; breaking furniture and threatening to injure and kill those who were his friends, and that these and other incidents, all of which have not been mentioned, show unsoundness of mind. Some of the medical experts expressed the opinion that a person acting in the manner in which Mowry was represented to have acted, must have been insane, and some of them characterized it as epileptic mania. On the other side, it is insisted that there was a complete failure to support the plea of insanity; that his conduct showed an infatuation, illicit and without hope; that when he was repulsed by Mrs. Godfrey he schemed to separate her from her husband by telling him that she was unfaithful to him, and that he was not the father of the infant child; and also by threatening to ruin the family, if the child was not given up; and that his purpose was further disclosed when he asked her to be his wife in case of Godfrey's death. There is testimony that he purchased a bottle of liquor shortly before the shooting, and several of the witnesses say that he appeared to be drinking and drunk upon that day. It is claimed that partial intoxication accounts for some of

his strange and unusual actions, and that when his relations with Mrs. Godfrey had been exposed, and he had failed to intimidate Godfrey and cause him to part from his wife, he then drank liquor to nerve him for what he was about to undertake, deliberately secured a gun, loaded it, and provided himself with ammunition, and called at Godfrey's house for the purpose of killing Mrs. Godfrey, and sought to carry out that purpose by shooting into the room where he supposed her to be.

We shall not undertake, nor is it necessary, to give a detailed statement of the mass of testimony which was taken in the case. We have examined it carefully, and we readily reach the conclusion that the verdict of the jury ought not to be disturbed. There is much in the testimony showing design and intelligent efforts to accomplish it. His consciousness of guilt, his fear and efforts to escape after committing the felony at Godfrey's house, his coolness and deliberation in three times halting his pursuer, and in firing the fatal shot, and his subsequent recollection of all that occurred during his flight and capture, make an exceedingly strong case showing responsibility, and it is difficult to see how the jury could have reached a different result.

There is an objection made to an instruction wherein the court states the test of responsibility in a prosecution where insanity is asserted as a defense. The court directed the jury that —

"If he was laboring under such a defect of reason from disease of the mind as not to know the nature and quality of the act he was doing, or if he did know it, that he did not know that what he was doing was wrong, then the law does not hold him responsible for his act. On the other hand, if he was capable of understanding what he was doing, and had the power to know that his act was wrong, then the law will hold him criminally responsible for it. . . . If this power of discrimination exists, he will not be exempted from punishment because he may be a person of weak intellect, or one whose moral perceptions are blunted or illy developed, or because his mind may be depressed or distracted from brooding over misfortunes or disappointments, or because he may be

wrought up to the most intense mental excitement from sentiments of jealousy, anger, or revenge. . . . The law recognizes no form of insanity, although the mental faculties may be disordered or deranged, which will furnish one immunity from punishment for an act declared by law to be criminal, so long as the person committing the act had the capacity to know what he was doing, and the power to know that his act was wrong."

We think the court stated the correct rule of responsibility where insanity is asserted as a defense. The "right-and-wrong test" was approved by this court in *The State v. Nixon*, 32 Kas. 205. It is there said that—

1. Insanity; correct instruction.

"Where a person at the time of the commission of an alleged crime has sufficient mental capacity to understand the nature and quality of the particular act or acts constituting the crime, and the mental capacity to know whether they are right or wrong, he is generally responsible if he commits such act or acts, whatever may be his capacity in other particulars; but if he does not possess this degree of capacity, then he is not so responsible."

This test has received the almost universal sanction of the courts of this country. (Lawson on Insanity, 231–270.)

The defendant urges that the instruction is erroneous because it excludes the theory of an irresistible impulse or moral insanity. This question received the attention of the court, and was practically decided, in *The State v. Nixon*, supra, although the question was not fairly presented in that case. It is there recognized as a dangerous doctrine, to sustain which would jeopardize the interests of society and the security of life. Mr. Justice VALENTINE says that—

"It is possible that an insane, uncontrollable impulse is sometimes sufficient to destroy criminal responsibility, but this is probably so only where it destroys the power of the accused to comprehend rationally the nature, character and consequences of the particular act or acts charged against him, and not where the accused still has the power of knowing the character of the particular act or acts, and that they are wrong."

Further along, he says that—

"The law will hardly recognize the theory that any uncontrollable impulse may so take possession of a man's faculties and powers as to compel him to do what he knows to be wrong and a crime, and thereby relieve him from all criminal responsibility. Whenever a man understands the nature and character of an act, and knows that it is wrong, it would seem that he ought to be held legally responsible for the commission of it, if in fact he does commit it."

In a very recent case the supreme court of Missouri considered the refusal of the trial court to charge that if the defendant obeyed an uncontrollable impulse springing from an insane delusion, he should be acquitted. The court repudiated that doctrine, and Judge Sherwood remarked, in deciding the case, that "It will be a sad day for this state when uncontrollable impulse shall dictate a rule of action to our courts." (*The State v. Pagles*, 4 S.W. Rep. 931.) It is true that a few of the courts have adopted this principle, but by far the greater number have disapproved of it, and have adopted the test which was given in the present case. (Lawson on Insanity, 270, 308.)

The court was requested to instruct that if there was a reasonable doubt as to whether the defendant was intoxicated or insane at the time the offense was committed, there must be an acquittal. This request was properly refused. Insanity is a defense, and upon that question the jury were correctly charged; but a reasonable doubt of the defendant's intoxication, or even if his drunkenness at the time was undoubted, would not necessarily exempt him from legal responsibility.

2. Voluntary intoxication, no excuse for crime. While voluntary intoxication is no excuse for crime, yet where the crime charged is murder in the first degree, which involves the condition of the mind when the act was committed, drunkenness may be considered by the jury in determining whether there was that deliberation, premeditation and intent to kill necessary to constitute the offense. This principle was fairly stated to the jury, and the elements of the crime charged, together with

the doctrine of reasonable doubt, were fully placed before the jury.

Complaint is made of a charge of the court relating to arrest. On this subject the court instructed that—

"Where a felony has been recently committed by any person, and a private citizen has reasonable cause to suspect that such person is guilty of its commission, the law authorizes such private citizen, while acting in good faith, to arrest the person who has committed the felony in order to prevent his escape, and in so doing he may use such personal force as appears necessary, under the circumstances, to effect the arrest; and in such case, if the person whose arrest is attempted has reasonable grounds for believing that is the actual intention of the person attempting the arrest, and his motives for so doing, he would not be justifiable in law in resisting the arrest."

This instruction is correct, and applicable to the facts in the case. Mowry had committed a felony, and was instantly pursued by the deceased in an endeavor to arrest him. The deceased was pursuing him in a temperate and proper manner, without arms and without violence, to make the arrest. He had the right to make the arrest in this manner without a warrant, and hence the request for an instruction upon the subject of a void and illegal arrest was properly refused; and the argument of the appellant upon that question does not apply.

*3. Felony; arrest by private person.*

Neither is there any force in the objection that the testimony fails to show that Mowry was not notified nor aware of the purpose of the deceased in pursuing him. Notice is only required to give the person an opportunity to desist from flight and unlawful action, and to peaceably surrender. If he necessarily knows the purpose of the pursuit and attempted arrest, no notice is needed. It is murder for a person to kill one whom he knows is pursuing him for a felony which he has just committed; and it has been said that "where a party has been apprehended in the commission of a felony, or on fresh pursuit, notice of the crime is not necessary, because he must know the reason why he is apprehended." (Wharton's Crim. Law, 418.)

*4. Notice to criminal; purpose of pursuit.*

The further objection is made, that the court failed to charge the jury upon the law of all the degrees of the crime of homicide inferior to and included in the one charged. The jury were instructed on the law of murder in the first and second degrees, and also upon the law of the third and fourth degrees of manslaughter. There was no testimony tending to show that the defendant was guilty of manslaughter in either the first or the second degree, and therefore no instruction on those degrees was required or proper. The instructions should conform to the testimony of the case. If there is even slight evidence that the defendant may have committed a degree of the offense inferior to and included in the one charged, the law of such inferior degree ought to be given, but should never be given upon a degree of the offense which the evidence does not tend to prove. An instruction upon either the first or the second degree of manslaughter would not have been wholly inapplicable to the facts in the case, and might have confused and misled the jury. The action of the court in this respect was not erroneous. (*The State v. Mize*, 36 Kas. 187; same case, 13 Pac. Rep. 1; *The State v. Rhea*, 25 Kas. 576; *The State v. Hendricks*, 32 id. 566.)

5. Degrees of crime; instruction, when not required.

There are other objections to the charge, none of which are regarded to be material, and examination of the entire record satisfies us that the case was fairly tried, and that no sufficient ground for a reversal exists.

The judgment of the district court will therefore be affirmed.

All the Justices concurring.