No. 38,141

THE STATE OF KANSAS, *Appellee,* v. PRESTON F. McBRIDE, *Appellant.*

(226 P. 2d 246)

Opinion filed January 6, 1951.

*Bill R. Cole,* of Hutchinson, argued the cause, and *Donald M. Bailey,* also of Hutchinson, was with him on the briefs for the appellant.

*John Fontron* and *John R. Alden,* both of Hutchinson, argued the cause, and *Harold R. Fatzer,* attorney general, and *Fred C. Preble,* of Hutchinson, were with them on the briefs for the appellee.

The opinion of the court was delivered by

KAGEY, J.: This is an appeal from a conviction of murder in the first degree.

Briefly the facts are as follows: On February 14, 1950, Preston F. McBride, appellant herein, purchased a .22 caliber revolver in Hutchinson, Kansas. The evening of that day he spent with a friend and his girl from 6:30 until after midnight, meeting no one else. The following morning, February 15, shortly after 8:00 o'clock, appellant placed an anonymous phone call to the McVay Taxi Company from a booth at St. Elizabeth Hospital, where he was working on a construction project, and asked that a message be sent to a workman named McBride that he was wanted at home at once; a cab was dispatched and on its arrival appellant asked to be taken home. The driver started to the address given by ap-

pellant (which was later proved to be a fictitious one) but appellant left the cab a block before he reached the address given. Later that same morning, appellant cleaned and loaded the gun and then shortly after 10:00 o'clock again called the cab company without giving his name, this time from a downtown restaurant, and asked that a cab be sent there. No specific cab or driver was requested so the operator dispatched the cab of John Watkins. After picking up the appellant and learning he wanted to go out of town, Watkins drove back to the cab company office where he exchanged his cab for a car. Appellant did not go into the office. They then drove southwest of Hutchinson, appellant being in the back seat of the car directing Watkins where to go. As they proceeded on a dirt road, appellant told Watkins to slow down as they were coming to a lane where they would turn. As Watkins did so, appellant, without warning, shot him several times in the back of the head with the .22 caliber revolver purchased the day before. Appellant then reached over, stopped the car, got under the wheel, pushed Watkins' body over and proceeded back to Hutchinson with Watkins' body in the car. On the way he attempted to remove the governor from the car so that it would go faster.

In Hutchinson, appellant parked the car, went to the Y. M. C. A. where he roomed, got some clothing and personal effects, threw some expended .22 caliber cartridge cases in the window base and returned to the car. He then proceeded to drive toward Wichita, passing through the outskirts of that city to a point near Derby, Kansas, where the car became stalled. During the trip, he took four or five dollars from the billfold of deceased and threw the billfold from the car. After the car stopped, appellant attempted to remove the body and go on with the car, but being unable to get the body out, determined to abandon the car. He threw his bloodstained jacket in a nearby thicket and walked to the home of a farmer living nearby where he hired the farmer to take him to Wichita, telling him he had burned a rod out of his car and had to be at work at Boeing's Aircraft Company by 4:00 o'clock. Appellant paid the farmer three one-dollar bills. On his arrival in Wichita, appellant went to the home of Mr. and Mrs. Victor Casper where he showed Mrs. Casper the gun, which was fully loaded, and asked her to keep it. The gun was then placed in a dresser drawer. That evening when Mr. Casper came home, his wife told him of the gun, whereupon Casper took it from the dresser drawer, upbraided McBride for bringing it into his house, and unloaded the same, placed

the shells on top of the bureau and replaced the gun in the drawer. Neither Mr. nor Mrs. Casper had previously seen the gun. That night appellant called his former wife from Casper's residence and had an angry conservation with her after which he loaded the gun and placed it in his trousers. Upon discovering this, Casper talked him out of the gun, unloaded the same and gave it to his wife who put it under the pillow on the bed. Casper then took the appellant to the home of appellant's sister. There appellant was found by Wichita police in the early morning of February 16, partially clothed, hiding on the ledge in the basement. Upon being questioned by Wichita officers, appellant told them he was connected with a dope ring which flew dope into Wichita by airplane; that deceased Watkins also had been connected with the ring and was "squawking" and that appellant had been ordered to kill Watkins upon threat of harm to his wife and child. Pursuant. to the order, he said, he had called the Yellow Cab office and asked them to send Watkins to pick him up.

Appellant told two stories as to where he got the gun, the first being that he had secured the gun at the home of Vic Casper the evening of the 14th to "bump off" Watkins, and the second that Casper gave him the gun at 6:30 o'clock Wednesday morning in front of the Liberty Café after having visited him in Hutchinson the night before and telling him he had a job for him to do. He said further that he had cut a slit in his jacket on Tuesday evening before the murder so he could carry the gun therein. On investigation these stories proved to be false, and the name of one of the persons supposed to have been connected with the dope ring, the asserted pilot of the plane, proved to be the name of a reformatory inmate. Upon being confronted with the fact that his story had been investigated and proved to be without any foundation, appellant stated that he had killed Watkins because he wanted to steal a car.

An information was filed by the county attorney on March 18, 1950, charging appellant with murder in the first degree. On March 22, 1950, the county attorney filed a motion in the case setting forth the fact that there was some question as to whether appellant was able to comprehend his position and make his defense, and requesting the court to appoint a commission to examine appellant and inquire into his mental competency and to determine whether appellant was able to comprehend and understand his position and to make his defense thereto. This motion was sus-

tained by the court and two psychiatrists were appointed as a commission to examine appellant and file their report. The commission made an examination of appellant on March 27 and returned its findings to the court on March 29, 1950. The pertinent parts of the report read:

"We, the undersigned Drs. Thomas L. Foster and M. E. Eckart, Commissioners appointed for the purpose of determining whether Preston F. McBride who now stands charged with the offense of murder in the first degree is sane or insane and whether the said Preston F. McBride is able or unable to comprehend his position and make a defense, do upon our oaths find as follows:

"That the above named party Preston F. McBride is sane and that he, the said Preston F. McBride, is able to comprehend his position and to make his defense."

The foregoing proceedings were in accord with our law and are not questioned here.

The case came on for trial on April 17, 1950; the jury on April 22, 1950, returned its verdict of guilty of murder in the first degree, to be punished by death.

Appellant filed his motion for new trial which was by the court overruled and judgment was entered on the verdict of the jury, from which judgment and sentence appellant brings his case here on four separate assignments of error. We will treat them in their order as discussed in appellant's brief.

First, appellant contends that the verdict is contrary to the evidence predicated on the theory that evidence was introduced fairly tending to prove insanity, both presently and as far back as 1944; that a continuing presumption of insanity was raised thereby and that there was no competent proof to rebut such presumption. That where the defense of insanity is interposed, the defendant is not required to prove that he is insane by a preponderance of the evidence. To the latter statement the state agrees. However, in this case no instruction was given by the court requiring defendant to prove insanity. On the contrary, the court in instruction No. 13 stated to the jury:

"One of the defenses advanced by the defendant in this case is that he was insane, laboring under a defect of reason from disease of the mind so that at the time of the homicide he did not know the nature and quality of the act he was doing, or if he did, that he did not know his act was wrong.

"The jury are instructed that if you find from all the evidence in the case that at the time of the commission of the homicide that the defendant was laboring under a defect of reason from disease of the mind so that at that time he did not know the nature and quality of the act he was doing, or if he did

know what he was doing, did not know his act was wrong, then the law does not hold him responsible for his act. On the other hand, if he was capable of understanding what he was doing, and had the power to know his act was wrong, then the law will hold him criminally responsible for it.

"If this power of discrimination existed he was sane, or, in other words, a person of sound memory and discretion, and will not be exempt from punishment because he might have been a person of weak intellect or one whose moral perceptions were blunted or illy developed, or because his mind may have been depressed or distracted from brooding over misfortunes or disappointments or because he may have been wrought up to the most intense mental excitement from sentiments of disappointment, revenge or anger.

"The law of Kansas recognizes no form of insanity, although the mental faculties may be disordered or deranged, which will furnish one immunity from punishment for an act declared by law to be criminal, so long as the person committing the act had the capacity to know what he was doing and the power to know that his act was wrong.

"It devolves upon the state to prove to your satisfaction, beyond a reasonable doubt, the defendant's sanity, as above defined, at the time of the shooting. If you believe from all the evidence in the case, beyond a reasonable doubt, that the defendant at the time and place, and in the manner charged in the information, shot and killed John C. Watkins, but do entertain a reasonable doubt as to his sanity at the time of the alleged commission of such crime, then you must acquit the defendant on the ground of insanity at the time of the alleged commission of the crime."

The above instruction is in accord with the views expressed by this court in a long line of decisions. ( *State v. Nixon,* 32 Kan. 205, 4 Pac. 159; *State v. Mowry,* 37 Kan. 369, 15 Pac. 282; *State v. Arnold,* 79 Kan. 533, 100 Pac. 64; *State v. White,* 112 Kan. 83, 209 Pac. 660.)

The question of the sanity of the accused at the time of the alleged commission of the offense is one to be determined by the jury upon the evidence introduced bearing upon such an issue. ( *State v. Eye,* 161 Kan. 69, 166 P. 2d 572.)

An examination of the record fails to disclose any evidence that appellant was afflicted with insanity. The testimony of appellant's mother that he had suffered an attack of spinal meningitis in 1944 after which he did not respond to normal conversation as he previously had done and that in the Reno county jail he seemed kind of blank does not go to the extent of establishing insanity. Nor does the testimony of a witness that from things appellant said at one time he appeared unusual, but that he considered him to be a normal person.

The two alienists called by appellant testified that appellant was sane both at the time of the homicide and at the time of trial. They had previously examined appellant as commissioners appointed by

the court and thus had ample opportunity to observe him and to form opinions as to his mental condition.

It is true the doctors testified that appellant had a psychopathic personality, that is, mentally abnormal but not psychotic; that a person with a psychopathic personality is but illy adapted to social life, but he understands the difference between right and wrong, understands the nature and quality of his actions, and is capable of responsibility for his actions. The fact that appellant, charged with the offense of murder in the first degree, tells conflicting stories and untruths, does not prove him insane. Rather, his actions were those of a deliberate murderer: Appellant purchased the murder weapon the day preceding the murder; next day he placed an anonymous call to a taxicab company and asked that a fictitious message be sent to him calling him from work to his home; he left the taxicab which took him away from work a block from where he had said he lived; his second call for a cab was placed anonymously from a local cafe, and when the cab driver exchanged the taxicab for an automobile, appellant did not go inside the company office; he ordered the driver to take him to the country, directing the course of travel to a side country road where he shot the driver, took possession of the automobile with the body of the deceased therein, and attempted to remove the governor from the automobile so that it would run faster; as he drove from Hutchinson toward Wichita, he took from the body of deceased what money there was and threw away the identifying wallet; he skirted around the city of Wichita to a wooded section where the automobile became mired and after trying to remove deceased's body therefrom and finding it impossible, he abandoned the car, threw away his blood-stained jacket and walked to a farmhouse where he hired a farmer to take him to Wichita.

We shall not undertake, nor is it necessary, to give a detailed statement of the mass of testimony which was taken in this case. We have examined it carefully, and readily reach the conclusion that the verdict of the jury is sustained by ample competent evidence and ought not to be disturbed.

Second: Appellant contends that the court should have given an instruction defining the words "idiot" and "imbecile" and especially the meaning and intent of the words "person of unsound mind" as the terms are used in sec. 4, ch. 323, Laws of 1949.

There is but one test by which the mental responsibility of a de-

fendant is to be gauged in this state and that test was properly set forth by the court's instruction No. 13, supra. It is the condition of mind of the accused which determines whether he is criminally accountable for·the act denounced by the statute as criminal, and not the name of the mental infirmity, if such infirmity exists. (*State v. Arnold*, supra.) The form or species of insanity is not, in the last analysis, material, and need not be distinguished in the instructions; if the proper test of criminal responsibility for the act in question be given, the substantial rights of the defendant have been protected. (*State v. Moore*, 80 Kan. 232, 102 Pac. 475.)· Moreover, the record fails to disclose any evidence whatsoever that appellant was afflicted with "idiocy" or that he was an "imbecile" or a person of "unsound mind".

Third: Appellant contends that the court erred in refusing to instruct the jury on the "irresistible impulse" test for insanity. We have examined the record carefully and find no evidence sustaining appellant's contention that his acts were motivated by any "irresistible impulse"; and the court did not err in failing to give an instruction thereon.

Fourth: Appellant contends the court erred in not permitting him to continue with examination of the witness John Fontron, county attorney.

Mr. Fontron testified that he had requested appointment of a commission to examine the mental condition of appellant. No objection appears in the record to this testimony, and no effort was made to elicit from the witness any additional testimony. There is therefore nothing for this court to review on this assignment of error.

From a careful analysis of the proceedings, we fail to find any error in the record prejudicial to the rights of appellant. The judgment is affirmed.

WEDELL J., not participating.