No. 44,586

STATE OF KANSAS, *Appellee*, v. GARY M. COLTHARP, *Appellant*.

(433 P. 2d 418)

Opinion filed November 13, 1967.

*Clyde Wendelken,* of Wichita, argued the cause, and *Henry E. Martz, W. A. Bonwell, Jr.,* and *Elliott Fry,* all of Wichita, were with him on the briefs for the appellant.

*R. K. Hollingsworth,* Deputy County Attorney, argued the cause, and *Keith Sanborn,* County Attorney, and *Robert C. Londerholm,* Attorney General, were with him on the briefs for the appellee.

The opinion of the court was delivered by

KAUL, J.: This is an appeal from a conviction of assault with felonious intent. (K. S. A. 21-431.) The defense was predicated on insanity of defendant at the time of the offense. The principal contention on appeal is that the verdict was not sustained by substantial competent evidence on the issue of insanity.

The defendant-appellant, Gary M. Coltharp, was employed as a greens keeper at the Spring Lakes Country Club near Wichita in Sedgwick County. Clarence Brannum, the victim of the assault, was manager of the country club and the employer and supervisor of defendant.

The events leading up to the prosecution are undisputed and can be stated briefly.

On the morning of March 16, 1965, defendant was in the club dining room talking to a member. Brannum approached defendant and inquired why he was not out on the course mowing greens instead of talking to members in the dining room. A brief argument ensued between the two men and concluded with a conversation in which Brannum said "Well, if you don't like the way we do things around here, you can just leave." Defendant replied, "All right, I'm leaving, give me my check." Brannum told defendant his check was not ready and he could come back and get it on pay day. Defendant then said "All right, I'm leaving," and that, "At 5:00 o'clock tonight I'll have this place closed."

About 1:00 or 1:30 that afternoon defendant returned to the club and informed an employee that he wanted to see Brannum. Brannum was notified and came out of his office into the hallway where defendant was standing. Brannum, with his hands in his pockets, walked toward defendant, who said "Don't come any closer, Clarence. I came to get my check." Brannum approached to within a few feet of defendant when defendant drew a .22 caliber revolver and started shooting at Brannum. Brannum started to fall to the floor after he was hit by the first shot and as he fell he was hit a second time. While lying on the floor he was hit in the shoulder by a third shot. At this point, defendant walked over and stood over Brannum and said "if those haven't got you, this one will," and then shot him in the head. After firing the fourth and final shot defendant walked into the dining room sat down and put the revolver on a table. He refused to give the gun to any one. Officers from the sheriff's office arrived and defendant surrendered to them without resistance.

A complaint was filed and defendant was taken before the Court of Common Pleas of Sedgwick County the same afternoon. The court appointed H. B. Malone, an experienced attorney of Wichita to represent defendant and set the preliminary hearing for March 29, 1965. Defendant was bound over for trial in the district court and an information was filed.

On May 17, 1965, on motion by defendant's counsel, the trial court appointed Dr. Don George, a psychiatrist, to examine defendant and determine his competency to stand trial. On July 29, 1965, the trial court received and approved the findings of Dr. George that defendant "is at this time insane but able to compre-

hend his position but not able to make a defense." Defendant was committed to the State Hospital at Larned for safekeeping and treatment pursuant to the provisions of K. S. A. 62-1531 (now K. S. A. 1965 Supp. 62-1531). On November 26, 1965, after receiving a report (not shown in the record) of staff physicians of Larned State Hospital, the defendant was ordered to be returned for trial. On arraignment the defendant entered a plea of not guilty by reason of insanity. The case came on for trial on January 18, 1966, and terminated in a verdict of guilty on January 21. Defendant filed a motion for a new trial which was heard and overruled. After allocution the state offered evidence of a prior felony conviction which was admitted. The defendant was sentenced to confinement in the Kansas State Penitentiary for a term of not less than two nor more than twenty years pursuant to the provisions of K. S. A. 21-431 and 21-107a.

Thereafter present counsel was appointed and this appeal was duly perfected.

Defendant presents three points in his brief. In his first and principal contention defendant submits the verdict was not supported by substantial competent evidence with specific reference to the issue of insanity.

The defendant concedes there is a presumption of sanity in a criminal proceeding that may be relied upon by the prosecution to establish a prima facie case. (State v. Penry, 189 Kan. 243, 368 P. 2d 60; State v. McBride, 170 Kan. 377, 226 P. 2d 246.) Defendant, however, argues the presumption was overcome by the testimony of Dr. George, a witness for defendant. Dr. George, as we have indicated, had been appointed to conduct the pretrial examination of defendant.

When Dr. George was called to the witness stand the court, with no objection, instructed as follows:

"The Court: The new Code of Kansas provides that the Court may instruct from time to time during the trial if he deems it advisable. Ordinarily and formerly, instructions were only given at the close of the case after all the evidence was in; but in this particular case I'm going to deem to advise on one facet of it at this time in as much as the question of insanity has arisen.

"Dr. George, you might pay attention to this instruction too because it will certainly guide your testimony.

"This instruction goes as to what the legal definition of insanity is in the State of Kansas in criminal cases. It's different than just regular probate insanity or civil insanity.

"Insanity, to constitute a legal defense to the charge of a crime, means that

the defendant is laboring under such a defective reason from disease of the mind as not to know the nature and quality of the act he is doing, or if he did know it, that he did not know that it was wrong.

"Basically, that is the test in Kansas. There is another part to the instruction I'll give later.

"Do you understand that definition, Doctor?

"The Witness: Yes, I do."

The testimony of Dr. George related to his examination of defendant on June 7, 1965. Essentially, Dr. George found defendant possessed a content of thought preoccupied with violence, bitterness, and hatred of duly constituted society. Dr. George also found hints of marked dependency and some indication that defendant "could quite possibly be a severely, mentally ill person, a psycho-pathic person—or in the legal category the terminology is insane." Dr. George further described the symptoms as schizophrenic reaction, pseudo-psychopathic type. Dr. George was further questioned concerning his diagnosis as follows:

"Q. This was your—were you able to reach a diagnosis as to his mental condition on March 16 of 1965 when he committed this assault?

"A. That was some 3 months prior to the examination?

"Q. Prior to the time that you saw him.

"A. No, I was not as a result of this examination and the psychological testing which was subsequently done—one can speculate with a considerable degree of certainty as to what his emotional state was on March 16, but I couldn't testify with absolute certainty that it was such and such a way on that particular day.

"Q. And that is because of the lapse of time?

"A. Yes, some three months later as he came for examination."

Dr. George described the psychological tests given to defendant as a part of the examination from the results of which he found evidence confirming his clinical impressions. In conclusion Dr. George gave his opinion that at the time of the offense defendant didn't know the act he committed was wrong.

On cross-examination an hypothesis, based on all of the circumstances surrounding the act, was submitted to Dr. George and he was asked if he could say with reasonable medical certainty whether defendant knew his act was wrong. He replied:

"I don't think he did. I think that he felt that he was defending himself from destruction at the hands of Mr. Brannum.

"He was in touch with reality in many ways and always has been—every sick person is. Where his misperception was, was in the degree of threat and the misperception of Mr. Brannum's designs on him, if you want to put it that way, what could come to him at the hands of Mr. Brannum."

In rebuttal the state called Dr. Manuel Guzman, a physician attached to the staff at Larned State Hospital. Dr. Guzman's testimony was based on his examination and observation of defendant during his stay at Larned, commencing in November 1965. Dr. Guzman described defendant's condition as that of a character disorder—not exactly a psychotic condition. He testified that defendant was subjected to psychological tests while at Larned and the results of the tests also indicated a character disorder. He described defendant as a borderline case; that his character disorder had advanced to the point of being almost at the limit within the psychosis and character disorder. Dr. Guzman testified in substance that defendant was capable of knowing whether or not his acts were right or wrong while he was in the hospital. When asked if he could project back to defendant's condition on the date of the assault, Dr. Guzman replied "It would be very hard because it would be just a speculation on my part."

The state called eight lay witnesses including the victim and his wife, Ella Fae Brannum, the sheriff and a deputy.

A number of the state witnesses testified to defendant's demeanor before and after the shooting. Several were fellow employees of defendant.

Defendant's argument is based on the premise that the testimony of Dr. George overcame the presumption of sanity and absent the presumption the state's evidence was insufficient to warrant a verdict of guilty.

The defendant relies on the case of *Phillips v. United States*, 311 F. 2d 204 (10th Cir. 1962), wherein it was held evidence of a long history of mental illness was sufficient to dissipate the legal presumption of sanity, thereby requiring the government to prove beyond a reasonable doubt criminal responsibility as an essential element of the offense.

The rule stated in *Phillips*, however, is not the law of this jurisdiction. A similar issue was before the court in *State v. Mendzlewski*, 180 Kan. 11, 299 P. 2d 598, where a defendant entered a plea of not guilty by reason of insanity and produced the testimony of a psychiatrist, we stated:

"However, it does not follow, as appellant suggests, that the mere interposition of such a defense in a criminal prosecution entitles a defendant to an acquittal. Nor does it follow, as is argued that regardless whether the state, through the medium of nonexpert witnesses, has adduced testimony tending to show the defendant in a murder case is sane, the accused is entitled to an

acquittal simply because he has produced a Clinical Psychologist who has testified such defendant was insane at the time of the commission of the involved offense. Under such circumstances this court has long been committed to the rule (see, e. g., *State v. Eye*, 161 Kan. 69, 166 P. 2d 572; *State v. McBride*, 170 Kan. 377, 381, 226 P. 2d 246; *Fisher v. Fraser*, 171 Kan. 472, 476, 233 P. 2d 1066; *State v. Hockett*, 172 Kan. 1, 5, 238 P. 2d 539), recognized by courts of other jurisdictions (14 Am. Jur., Criminal Law, 799 §41; 26 Am Jur., Homicide, 509 §505; 23 C. J. S., Criminal Law, 624 §1130) that the question whether a defendant in a criminal action was sane or insane at the time of the commission of the offense with which he stands charged is one to be determined by the jury, under proper instructions from the court, upon the evidence introduced bearing upon such issue. Moreover, and again in line with the general rule (see 22 C. J. S., Criminal Law, 124 §59; 14 Am. Jur., Criminal Law, 796 §40), we have held repeatedly that the test for determining liability for commission of such crime *is* whether he was capable of distinguishing between right and wrong at the time with respect to the act committed. (see, e. g., *State v. Nixon*, 32 Kan. 205, 4 Pac. 159; *State v. Mowry*, 37 Kan. 369, 15 Pac. 282; *State v. Arnold*, 79 Kan. 533, 100 Pac. 64; *State v. White*, 112 Kan. 83, 209 Pac. 660; *State v. McBride*, supra, p. 381; *Fisher v. Fraser*, supra, p. 476.)" (pp. 13, 14.)

We believe the rules laid down in *Mendzlewski* completely control the issues raised on the point under discussion here.

We make this further observation that even though the testimony of Dr. Guzman does not diametrically contradict the testimony of Dr. George, the creditability of Dr. George's conclusion could well have been damaged by the jury's consideration of Dr. Guzman's testimony that to project back to the time of the act would only be speculation.

The defendant submits three trial errors with respect to his second contention that he did not receive a fair trial. He first claims the trial court erred in interrupting the testimony of defendant's expert witness, Dr. George. Dr. George testified that because of the length of time between the alleged crime and defendant's examination by the doctor he was unable to specifically say that defendant was suffering from any particular thing on November 16, 1965. When the doctor, nevertheless, commenced to relate the results of defendant's examination the following took place:

"THE COURT: (Interrupting) Doctor, you cannot give speculation. If you cannot give an opinion as to reasonable medical certainty, do not give it.

"THE WITNESS: I would say that within the bounds of reasonable medical certainty that this *is* possible so, Judge.

"THE COURT: Anything within that bounds you may give."

The doctor continued his description of defendant's symptoms and explanation of the diagnosis limiting the relation thereof to the

date of the crime within the limits of reasonable medical certainty. We see no prejudice or abuse of discretion in the trial court's direction to the witness. The incident related does not approach a violation of the admonition laid down in *State v. Winchester,* 166 Kan. 512, 203 P. 2d 229, that a trial judge must not forget his function and assume the role of an advocate.

Defendant complains of Dr. Guzman's testimony concerning conclusions and opinions of other members of the Larned Hospital staff on the grounds that such testimony was inadmissible hearsay. No objection was made at the trial. This court has recently reaffirmed its commitment to the contemporaneous objection rule. (*State v. Adamson,* 197 Kan. 486, 419 P. 2d 860.) Therefore the point is not technically before us. Nevertheless we note the testimony of Dr. Guzman was primarily based on his own observation and examination. The form of his testimony was that he first made a determination of defendant's mental condition and then other members of the staff used Dr. Guzman's conclusions as a starting point to conduct further examination. Dr. Guzman as well as Dr. George in arriving at their respective opinions used material gathered from psychological tests given by psychologists under their directions. The opinion of an expert, otherwise qualified, when arrived at in the manner described, is not rendered inadmissible under the provisions of K. S. A. 60-456. The subject is discussed in depth and expressions of this court in line with what has been said here may be found in the recent case of *Casey v. Phillips Pipeline Co.,* 199 Kan. _____, 431 P. 2d 518.

Defendant complains the trial court's instruction on insanity though "admittedly accurate" requires careful reading to discern its true meaning. Here again, no objection was lodged at the trial. We have, however, examined the instruction in question and find it to be in substantial conformity with instructions on the subject approved by this court in the early case of *State v. Crawford,* 11 Kan. (2nd Ed.) *32, and in many cases decided thereafter. (See *State v. Andrews,* 187 Kan. 458, 357 P. 2d 739, cert. den. 368 U. S. 868, 7 L. Ed. 2d 65, 82 S. Ct. 80, and cases cited therein.)

The defendant objects to an instruction by the court stating in substance that acting in response to an irresistible impulse is not a test for insanity and not a defense for a criminal act in Kansas. In the testimony of Dr. George there was some indication that defendant's mental condition was such that he had a tendency to re-

spond to an irresistible impulse. The trial court has a duty to instruct the jury on all matters of law necessary for the jury to reach a verdict. Since the instruction was relevant to the evidence and correctly stated the law in connection therewith we find no error in its submission.

We turn to the defendant's final complaint. Before sentence was pronounced the state introduced, over defendant's objection, evidence of a prior Oklahoma conviction upon a guilty plea of automobile theft. The objection is lodged on the premise that defendant was only fifteen years of age at the time of the Oklahoma conviction and therefore it cannot be used as a basis for the imposition of K. S. A. 21-107a. The state points out, and the defendant acknowledges, that under the rule announced in *State v. Engberg*, 194 Kan. 520, 400 P. 2d 701, cert. den. 383 U. S. 921, 15 L. Ed. 2d 676, 86 S. Ct. 899, the validity of the Oklahoma judgment is not subject to collateral attack in this proceeding. However, because of the nature of the objection raised we have examined the merits thereof.

It is true, of course, an accused of the age of fifteen years under the law of this state, could not be convicted of a felony under such circumstances as surrounded the Oklahoma conviction. An examination of the Oklahoma Code reveals that with reference to the disposition of a delinquent child, Title 10 Okl. St. Ann. §112 provides in part as follows:

". . . The court may, however, in its discretion, cause such child to be proceeded against in accordance with the laws that may be in force governing the commission of the crime."

The Oklahoma statute referred to was construed in an exhaustive opinion in *Ex Parte Lewis*, 85 Okl. Cr. 322, 188 P. 2d 367. In substance the opinion holds that under the statutory provision quoted a child who has been adjudged delinquent by reason of the commission of a crime and whose competency to know the wrongfulness of acts has been determined, may be prosecuted for such crime in a court of competent jurisdiction. The record before us discloses the defendant was prosecuted for a crime amounting to a felony (sentence was three years imprisonment in the state penitentiary) in conformity with Oklahoma statutory and case law. There is no reason, therefore, to question the validity of the Oklahoma conviction on the grounds advanced.

The fact that he could not have been convicted of a crime in this state at the time does not avail defendant. Our holding in the

recent case of *Tyrell v. State,* 199 Kan. 142, 427 P. 2d 500, resolves the issue. It was held:

"Evidence of prior convictions by a court of a sister state of felonies, as defined by a statute of the sister state, may be properly received by a trial court of this state when imposing sentence under K. S. A. 21-107a." (Syl. ¶1.)

We find no error in the record in this case which may be said to have prejudiced the substantial rights of defendant. The judgment is affirmed.