No. 58,909

State of Kansas, *Appellee,* v. Deanna D. Hollis, *Appellant.*

(731 P.2d 260)

522

Opinion filed January 16, 1987.

*Melissa Sheridan*, assistant appellate defender, argued the cause, and *Benjamin C. Wood*, chief appellate defender, was with her on the brief for appellant.

*Geary N. Gorup*, assistant district attorney, argued the cause, and *Robert T. Stephan*, attorney general, and *Clark V. Owens*, district attorney, were with him on the brief for appellee.

The opinion of the court was delivered by

MILLER, J.: A jury convicted Deanna D. Hollis of first-degree premeditated murder, in violation of K.S.A. 21-3401, and she was sentenced in Sedgwick County District Court to life imprisonment. She appeals, and raises four issues. She contends that the trial court erred in failing to suppress certain statements which were secured in violation of her *Miranda* rights, and which were received as rebuttal evidence offered by the State. She claims that the evidence presented at trial was insufficient to sustain the conviction in that the State did not sustain its burden of proving beyond a reasonable doubt that she was sane at the time the offense was committed. She claims the trial court erred in admitting gruesome photographs of the deceased's remains, and the remains themselves, into evidence. Finally, she contends that the trial court erred in not granting a mistrial (a) when the prejudicial nature of Sabrenne Fullman's testimony became apparent; (b) following prejudicial news headlines, because the trial court did not fully explore the jury's exposure to such publicity; and (c) upon the occurrence of prosecutorial misconduct during closing argument.

We turn to the evidence, which we will summarize in the light most favorable to sustain the verdict. *State v. Baker*, 239 Kan.

403, 720 P.2d 1112 (1986); *State v. Pondexter*, 234 Kan. 208, 671 P.2d 539 (1983). Deanna Hollis first met the victim, Noel Barber, in late May 1985. Hollis accepted a job as live-in housekeeper and general caretaker for Barber in exchange for room, board, and use of his car. Hollis; her 15-year-old daughter, Angela Grill; her boyfriend, Michael Skipper; and two friends, Jeff and Wanda Davis, lived with Barber during June 1985. Skipper was an over-the-road truck driver, and he stayed at the Barber home when he was in town, receiving room and board in exchange for some work. The Davises and Grill left in late June after an argument between Grill and her mother. On June 25, 1985, Hollis, Skipper, and Barber were together at the residence. Skipper went to bed around 11:00 p.m., leaving Hollis and Barber "scrapping back and forth" in the living room. Skipper described Barber as very drunk, and Hollis "on her way to getting drunk." The next morning, Skipper arose about 4:45 a.m. to leave on a truck run. He saw Hollis pull a blanket over Barber, who was apparently sleeping on the couch in the living room. He never saw Barber again. Skipper and Hollis went to the Hen House Cafe for coffee and breakfast.

At the Hen House, Hollis told Skipper she had killed Barber but Skipper did not believe her. She later told him she was just kidding. Skipper left on the run and did not return until June 30. When he returned, Barber was gone and Hollis told Skipper that Barber was in a hospital "drying out." He called two hospitals and could not locate Barber, and when he confronted Hollis with this information, she told him that Barber was in a private sanitarium. Skipper went on other truck runs, and returned to Wichita on July 11, 1985.

On July 12, Skipper and Hollis had dinner with Angela Grill. Hollis wanted Grill to go on Skipper's next run because Hollis had some business to take care of. When Grill inquired as to Barber's whereabouts, Hollis repeated her story that he was in a hospital sobering up. Grill left the next day with Skipper. While on this run, Skipper told Grill that her mother said she'd killed Barber because Barber discovered some money was missing and threatened to press charges. Skipper again said that he did not believe the story. Skipper called Hollis from Tennessee to find out if she had taken care of the business she needed to tend to.

Hollis told him that she had chopped up Barber's body and burned it.

Skipper and Grill returned to Wichita on July 18. When Grill arrived at the residence, she noticed two black buckets by the door; they smelled bad. Hollis told her that the buckets contained fertilizer. When Skipper arrived later and inquired about the buckets, Hollis told him the same story.

Grill relayed Skipper's story and the information about the buckets to her friend Wanda Davis, and they decided to tell the police. They flagged down a patrol car and did so.

Officers went to the Barber residence. Officer Ingram advised Hollis of the purpose of their call, and she granted him permission to enter the residence. He went through it room by room and did not find a body. When Ingram asked Hollis where Barber was, she replied that he was in a V.A. hospital. Later, she said he was at the Topeka V.A. hospital. The officer checked with the Wichita and Topeka V.A. hospitals and found that Barber was not there. He then advised Hollis of her *Miranda* rights and asked if she understood; she indicated that she did. Sgt. Fleury noticed flies buzzing around two buckets in the living room. He asked Hollis what was in the buckets and she said that it was fertilizer. She granted Ingram permission to look in the buckets. Using surgical gloves, he reached in and pulled out what appeared to be human bones.

Detective Gilmore then read the *Miranda* rights to Hollis and secured a written waiver. He asked her where Barber was, and she responded that on July 6 or 7, she had hit him on the head with a whiskey bottle during an argument, gone to bed, and hadn't seen him since. Gilmore then took her to the county courthouse for in-depth questioning. En route, they engaged in general conversation. Hollis blurted out that there was no need to lie anymore and that she had killed Barber because she was upset with her family situation, that Barber had been making unwelcome sexual advances, and she had been wanting to kill someone for a long time.

At the courthouse, Hollis gave a detailed confession, during which Gilmore took notes. This interview was later repeated and recorded on audio tape. In the interview, Hollis stated that she and Barber had been drinking and arguing about her relationship with Skipper. After Skipper went to bed, the argument intensified and she smothered Barber with a pillow. She verified the

conversation with Skipper the next morning at the Hen House, and said that she returned home and wrapped the body in a blanket and put it in a bedroom while trying to decide what to do with it. A few hours later she wrapped the body in a pink plastic garment bag, put it in the car, and drove to a stream near Geary County State Lake, where she left it. She returned about a week later because she was concerned that she might get caught because her fingerprints were on the bag. She then tried unsuccessfully to burn the body. When this attempt failed, she put the body back in the car and drove it to a spot near Whitewater, where she hoped it would dry out so she could burn it. About a week later, she again retrieved the body and brought it back to the victim's house. She left the body in the car overnight and the next morning burned the body on the driveway in front of the car. She used gasoline to get the fire started, adding leaves and twigs and stirring the fire to keep it going. After the debris cooled down, she scooped it up with an ice tray and put it in two buckets which she put in the house. She added some type of chemical to the remains.

On the following day, Det. Gilmore went with Hollis to the various locations she had described, and recovered evidence which verified her story. Pursuant to a search warrant for the victim's residence, officers found gas cans; six burned areas in the yard, one of which contained small bone fragments; and two metal buckets in the living room containing ash and debris. The ash and debris and bone fragments from the burn area were taken to Wichita State University for examination.

Dr. Schneider, a physical anthropologist, determined that the buckets contained human remains which comprised about 85% to 90% of the skeleton of one human being. A variety of characteristics of the skeleton indicated to her that the victim was a Caucasian male over 50 who was about Barber's size. In addition, after comparing X-rays of Barber's skull with X-rays taken of skull and facial bones in the buckets, she was able to conclude that they appeared to be of the same person. A radiology specialist who also compared bone fragments with the X-rays testified that the bones and X-rays matched, and he could say with 99% certainty that the remains were those of Noel Barber. Dr. Schneider also testified that the bones recovered from the buckets exhibited characteristics that suggested some of the

body parts were burned while soft tissue was still attached to the bones, and that the bones were moved around in the fire as they burned.

Barber's bank records reflected several checks written on his account after June 25, 1985, including one payable to the defendant, and a deposit "less cash received," on July 5, 1985.

The trial transcript comprises some eight volumes and includes well over 1,000 pages. The foregoing is but a brief summary of the testimony. We will supplement this fact statement as necessary in our discussion of the issues raised on appeal.

The appellant states the first issue as follows: The trial court erred in allowing the State to use suppressed statements obtained in violation of Deanna's *Miranda* right to rebut the defense of insanity. This issue concerns conversations between defendant Hollis and Det. Gilmore on July 22 and August 2, 1985. After her first appearance in court on July 22, Hollis asked to see Det. Gilmore. When he appeared, she asked him what "premeditated" meant. He responded that it meant pre-planning, or the thinking out of some act. On August 2, Hollis sent a note to Gilmore. She requested cigarettes, and he took some to her at the jail. Gilmore noticed Mr. Greeno, one of Hollis' attorneys, sitting in the waiting room. It is not clear from the record whether Gilmore knew that Greeno was waiting to see Hollis, or whether he was in fact waiting to see Hollis. Gilmore gave Hollis the cigarettes he'd brought, and asked how she was doing and if she needed anything else. This was followed by general conversation, during which time Hollis volunteered that she was going to plead insanity. Gilmore asked her if she was insane, and she responded, "No, but I have no other option or no other way to go." At some point during this conversation, Hollis said that her attorney told her not to answer any questions by the police. The officer's original report of this conversation indicated that the statement regarding her attorney was made before she told Gilmore she was going to plead insanity. Det. Gilmore, during his testimony at the suppression hearing and on trial, recalled that the statement was made after Hollis had told him that she was going to plead insanity.

Hollis appeared for her initial court appearance prior to the July 22 conversation with Gilmore. During that court appearance, the court asked if she wished to have counsel appointed

and she responded that she had spoken with an attorney and that she intended to retain counsel. Defense counsel argued, and the trial court ultimately held, that this amounted to an assertion of her right to have counsel present at any further questioning. The court held that the statements were freely and voluntarily made, but that the statements were made in technical violation of the *Miranda* rule: she had asked for an attorney at the initial hearing, and the court concluded that this amounted to an assertion of her right to have counsel present at any further questioning. The court further ruled, however, that suppression of the statements in the State's case in chief would not block this evidence from coming in as rebuttal evidence.

Resolution of this issue hinges on whether the statements were obtained in violation of *Miranda*. The appellant relies upon *United States v. Hinckley*, 672 F.2d 1115 (D.C. Cir. 1982). The facts, however, are distinguishable. Hinckley attempted to assassinate the President of the United States, and also shot various other persons. He was immediately taken into custody. Later that day, two federal agents, after advising Hinckley of his right to counsel and his right to remain silent, and despite the fact that Hinckley asked to confer with an attorney before answering questions, proceeded to question Hinckley for approximately one-half hour before he had an opportunity to consult with counsel. This interview was not conducted at Hinckley's request, and it was conducted in obvious violation of the *Miranda* rule.

In the proceeding now before us, both contacts were made by the officer with Hollis at her request. During the July 22 meeting, the officer asked no questions. Hollis had just been arraigned, and presumably been given a copy of the complaint then filed against her. She asked to see Gilmore, and upon his appearance asked him the meaning of the word premeditated. He responded. This contact was completely and entirely voluntary upon the defendant's part.

Again, on August 2, Hollis sent a note to Gilmore asking for cigarettes which he brought to her. Obviously, she had already seen counsel, and she advised Gilmore that counsel had told her not to answer any of the officer's questions. During their general conversation, she volunteered that she was going to plead insanity. The officer's natural response was his question as to

whether or not she was having mental problems, to which she responded she was not, but she had no other way to go.

*Miranda* requires that prior to custodial interrogation, a person must be informed of the right to remain silent, the right to have counsel present during questioning, and the right to have counsel appointed if the person is indigent. Once the warnings have been given, interrogation must cease immediately if the individual asserts the right to remain silent or requests an attorney. *Miranda v. Arizona*, 384 U.S. 436, 467-74, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). Hollis was advised of her *Miranda* rights several times. She indicated that she understood them, and she signed a written waiver of those rights. It has frequently been held that constitutional rights may be knowingly and intelligently waived. In *State v. O'Neal*, 238 Kan. 183, 185-86, 708 P.2d 206 (1985), we said:

> "Where one who is in custody expresses a desire to deal with the police only through counsel or when counsel is present, further interrogation must cease until counsel is present. However, an accused may waive the right to have counsel present and, where the accused voluntarily initiates further communication, the officers are not precluded from responding. . . . The defendant appears to contend that once the police know a person is represented by counsel and has been told not to talk to the police officers, the officers cannot under any circumstances have any further conversation with that person. We rejected that rule in *State v. Costa*, 228 Kan. 308, Syl. ¶ 3, 613 P.2d 1359 (1980):
>
> " 'An accused may effectively waive the right to have counsel present during any police interrogation. The fact that he has previously retained counsel does not necessarily make inadmissible a voluntary statement made by the defendant in his counsel's absence.'
>
> "Here, defendant first informed the officer that he had counsel and had been advised not to talk in her absence. The officer started to leave. Defendant then asked direct questions of the officer concerning the investigation. Under all of the circumstances disclosed in this record, we conclude that the defendant initiated further conversation with Detective Clark and knowingly and intelligently waived his right to have counsel present while he spoke with that officer."

Under all of the circumstances in this case, we conclude that there was no Fifth Amendment violation under *Miranda*. While the appellant does not specifically argue a Sixth Amendment violation, that matter is raised at least tangentially. The Sixth Amendment provides that in all criminal prosecutions, the accused shall enjoy the right to have the assistance of counsel for his defense. Here, Hollis was advised, prior to her initial hearing, that she was entitled to have counsel, and if she could not afford counsel, one would be appointed for her. She was so

advised at the time of her initial appearance, when she chose to attempt to retain counsel. The July 22 conversation, initiated by Hollis, and in which no questions were propounded by the officer, certainly did not interfere with Hollis' constitutional right to counsel. Similarly, Hollis was well aware of that right when she made the voluntary statement to Gilmore on August 2. Both statements were freely and voluntarily made with full knowledge of all of her constitutional rights. As we said in *State v. Taylor*, 217 Kan. 706, 711, 538 P.2d 1375 (1975):

"[A]n accused may waive the right to have his counsel present during police interrogation after, as well as before, formal charges are filed against him."

Under the facts before us, we hold that the defendant, by initiating the conversations, knowingly waived both her Fifth and Sixth Amendment rights to counsel, and that the statements, freely and voluntarily made, were admissible. In view of this holding, we need not consider whether statements, suppressed as to the State's case in chief, may under certain circumstances later become admissible in rebuttal.

We turn to the defendant's contention that the evidence presented at trial was insufficient to sustain the conviction for the reason that the State did not sustain its burden of proving the defendant sane beyond a reasonable doubt. Before discussing this issue it will be helpful to review some of the applicable principles. We first quote from Justice Valentine, writing in *State v. Crawford*, 11 Kan. 32, 44-45 (1873):

"[T]he state is not required in the first instance to introduce evidence to prove sanity, for the law presumes that all persons are sane, and this presumption of sanity takes the place of evidence in the first instance. It answers for evidence of sanity on the part of the state. But if evidence is introduced which tends to shake this presumption, the jury must then consider the same, and its effect upon the main issue of guilty or not guilty, and if upon considering the whole of the evidence introduced on the trial, together with the presumption of sanity, the presumption of innocence, and all other legal presumptions applicable to the case under the evidence, there should be a reasonable doubt as to whether the defendant is sane or insane, he must be acquitted. . . . [The defendant] is required only to raise a reasonable doubt as to his guilt. The burden of proof is always upon the state, and never shifts from the state to the defendant."

In *State v. Boan*, 235 Kan. 800, 811-12, 686 P.2d 160 (1984), we quoted at length from the opinion of Justice Owsley in *State v. Nemechek*, 223 Kan. 766, 576 P.2d 682 (1978). That portion of the *Nemechek* opinion succinctly states the applicable principles:

" 'There is a presumption of sanity in a criminal proceeding that may be relied upon by the prosecution to establish a prima facie case. *(State v. Coltharp,* 199 Kan. 598, 433 P.2d 418 [1967].) The prosecution is never required to introduce evidence of sanity until some evidence is introduced which, if believed by the jury, could raise a reasonable doubt as to a defendant's sanity at the time the offense was committed. (See, *State v. Penry,* 189 Kan. 243, 368 P.2d 60 [1962]; *Wilson v. United States,* 288 F.2d 121 [D.C. Cir. 1960], *State v. Clokey,* 83 Idaho 322, 364 P.2d 159 [1961]; *People v. Smothers,* 2 Ill. App. 3d 513, 276 N.E.2d 427 [1971], *aff'd* 55 Ill.2d 172, 302 N.E.2d 324 [1973].) This evidence may come from either the defendant or the state. *(State v. Johnson,* 92 Kan. 441, 446, 140 Pac. 839 [1914]; *State v. Crawford,* 11 Kan. 32, 45 [1873]; *Davis v. State,* 90 Neb. 361, 133 N.W. 406 [1911]; *Lemke v. State,* 56 Okla. Crim. 1, 9, 32 P.2d 331 [1934]. The term "evidence," however, does not include the insanity plea or opening statements. Neither rebuts the presumption of sanity. *(State v. Coltharp,* supra at 602; *State v. Mendzlewski,* 180 Kan. 11, 13, 299 P.2d 598 [1956]; *United States v. Currier,* 405 F.2d 1039, 1042 [2d Cir. 1969], cert. denied 395 U.S. 914, 23 L.Ed.2d 228, 89 S.Ct. 1761 [1969]. *Cf., United States v. Marbley,* 410 F.2d 294 [5th Cir. 1969].) . . .

" 'The presumption of sanity is rebutted when evidence is introduced which could raise a reasonable doubt concerning a person's sanity. *(State v. Johnson,* supra at 447.) At that point the question of sanity becomes a question for the jury assisted by proper instructions. *(State v. Johnson,* 223 Kan. 237, 240, 573 P.2d 994 [1977]; *State v. Coltharp,* supra at 603; *State v. Mendzlewski,* supra at 14.) If the jury has a reasonable doubt as to a defendant's sanity at the time the offense was committed, it is under a duty to acquit the defendant. *(State v. McBride,* 170 Kan. 377, 226 P.2d 246 [1951]; *State v. Nixon,* 32 Kan. 205, 4 Pac. 159 [1884]; *State v. Crawford,* supra at 43.) It is a rare occasion when an insanity question should be taken from a jury by a motion for acquittal. In *State v. Gustin,* 212 Kan. 475, 510 P.2d 1290 (1973), we said:

" ' "A trial judge in passing upon a motion for judgment of acquittal must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If he concludes guilt beyond a reasonable doubt is a fairly possible result, he must deny the motion and let the jury decide the matter. If he concludes that upon the evidence there must be such a doubt in a reasonable mind, he must grant the motion." (Syl. 3.)

" 'In *State v. Chase,* 207 Kan. 352, 362, 480 P.2d 62 (1971), we quoted from *Dusky v. United States,* 295 F.2d 743, 756 (8th Cir. 1961), as to the test for acquittal in an insanity defense case:

" ' " ' . . . [I]n order to remove this case from the jury's consideration, . . . "reasonable men must necessarily possess a reasonable doubt as to defendant's sanity and . . . reasonable men must conclude that the government has failed to sustain its burden of proving beyond a reasonable doubt that the accused had the capacity to commit the crime." . . . ' "

" 'Unless evidence of insanity is so great that a trial judge can rule the government could not convince a reasonable man it has sustained its burden of proof as to defendant's sanity, the issue should go to the jury, as we have

recommended in the past. (*E.g., State v. Sagebiel*, 206 Kan. 482, 480 P.2d 44 [1971]; *State v. Chase*, supra; *State v. Coltharp*, supra; *State v. Mendzlewski*, supra.)' pp. 767-69."

Our opinion in *State v. Boan* also quoted and relied upon similar language found in *State v. Sanders*, 225 Kan. 147, 151, 587 P.2d 893 (1978).

In the early case of *State v. Nixon*, 32 Kan. 205, Syl. ¶ 1, 4 Pac. 159 (1884), we adopted the *M'Naghten* rule. Justice Valentine, writing for an unanimous court, said:

"Where a person at the time of the commission of an alleged crime has sufficient mental capacity to understand the nature and quality of the particular act or acts constituting the crime, and the mental capacity to know whether they are right or wrong, he is generally responsible, if he commits such act or acts . . . ."

We have since steadfastly adhered to the *M'Naghten* test. *State v. Wood*, 235 Kan. 915, 921, 686 P.2d 128 (1984), and see cases there cited. As to the right and wrong portion of the *M'Naghten* test, we explained in *State v. Boan*, 235 Kan. 800, Syl. ¶ 3:

"Under the 'right and wrong' test of criminal insanity, it must be proved that at the material time the accused did not know that what he was doing was contrary to law. It is not sufficient to prove that he believed that, while what he was doing was legally wrong, it was morally right."

Defendant in this case relied upon an insanity defense, and she presented the testimony of Dr. Marvin Ziporyn, a forensic psychiatrist, practicing in Chicago, Illinois. Dr. Ziporyn stated that in his opinion, based upon a reasonable degree of medical certainty, the defendant understood the nature of her act, understood it was prohibited by law, and understood that society would frown upon what she was doing. He found, however, that she was emotionally unstable and was suffering from a mental disorder, an organic brain syndrome. It was his opinion that as a result of her mental disorder, her judgment was impaired. Because of this impaired judgment she thought it was right to kill the deceased, and proceeded to do it.

The trial court recognized that Dr. Ziporyn did not express an opinion that the defendant was insane, according to the *M'Naghten* test; however, the court allowed the insanity issue to go to the jury "because it also co-mingles with the defendant's theory of the defense, that I was so drunk at the time that I did not form the requisite intent to kill."

In rebuttal, the State offered the testimony of Dr. Arnold Mark

Barnett, a neurologist. His staff performed two electroencephalograms of the defendant. No brain abnormalities were disclosed. The State also called Dr. John Schlueter, a diagnostic radiologist on the staff of the Wesley Medical Center in Wichita. Dr. Schlueter supervised the taking of the CT scan of the defendant. He discovered no abnormalities, and considered the defendant's brain scan to be normal. These witnesses, however, testified that it is possible that one could have brain abnormalities which would not show up on either the EEG or the CT scan. One of the bases for Dr. Ziporyn's conclusions was that Hollis told him that she hallucinated and believed she had telepathic powers. Yet Michael Skipper, with whom Hollis had an intimate relationship, testified that Hollis took care of herself, was able to communicate, and had never reported hallucinations or special powers. The jury also had evidence of Hollis' extensive actions after the homicide to conceal her crime, and it had the rebuttal testimony of Det. Gilmore as to the July 22 conversation with the defendant regarding premeditation, and the August 2 conversation about her intent to raise the insanity defense, although she did not consider herself insane, but she "had no other way to go."

The State, upon the presentation of its evidence in chief, had the right to rely upon a presumption of sanity. However, anticipating that the defendant would raise the insanity defense in accordance with her prior notice, the State presented some evidence of defendant's sanity during its case in chief. Lay testimony, as well as expert testimony, may be considered by the jury in determining the sanity or insanity of the accused. In *State v. Sanders*, 225 Kan. at 153, we held that even though the expert medical witnesses in a case were unanimous in their diagnosis that the accused was insane, expert medical testimony is not conclusive merely because it is not disputed by other medical testimony. The jury is entitled to consider all of the evidence in the case, both that of the expert witnesses and that of the nonexpert. Under all of the facts of this case, we have no hesitancy in holding that the State made a submissible case that the defendant was sane, and the trial court did not err in submitting the issue to the jury upon disputed evidence. Further, there was substantial competent evidence upon which a rational

trier of facts could have found the defendant sane beyond a reasonable doubt.

We turn to the challenged photographic and tangible evidence. The remains of the deceased consisted of small pieces of bone. These had been photographed, some at close range, and others arranged anatomically to show that pieces of bone had been recovered and identified as coming from various parts of the body. The bones, as well as the photographs of them, were received in evidence. Appellant argues that the evidence had little or no probative value because the defendant admitted the crime to the authorities in her confession, and she gave notice of intent to use an insanity defense. Some of the bones themselves and the close-up photographs were used by the State's expert witness, Dr. Schneider, to illustrate characteristics to which Dr. Schneider testified. She also used several of the bones to explain her testimony. The testimony confirmed that the remains were those of the victim, a fact certainly relevant to the State's case. While the defendant had confessed, the State still had the burden to prove every essential element of the charge beyond a reasonable doubt.

We have held that a trial court may exclude evidence which is unduly prejudicial and which is offered solely to prejudice the minds of jurors, as well as gruesome photographs which are unduly repetitious and add nothing to the State's case. See *State v. Garcia*, 233 Kan. 589, 593, 664 P.2d 1343 (1983), and *State v. Boyd*, 216 Kan. 373, 377, 532 P.2d 1064 (1975).

Evidence need not be excluded, however, merely because it portrays a gruesome crime. See, *e.g., State v. Williams*, 235 Kan. 485, 681 P.2d 660 (1984) (tape recording of rape); *State v. Crispin*, 234 Kan. 104, 671 P.2d 502 (1983) (photographs of victim of shooting and beating); *State v. Johnson*, 231 Kan. 151, 643 P.2d 146 (1982) (photographs of naked corpse of a person who had been badly beaten and stabbed five times); *State v. Henson*, 221 Kan. 635, 562 P.2d 51 (1977) (photographs of partially nude body of victim of sexual assault and multiple stab wounds). Photographs are not inadmissible because they are shocking or gruesome if they are relevant to material matters at issue. *State v. Green*, 232 Kan. 116, 118, 652 P.2d 697 (1982); *State v. Words*, 226 Kan. 59, 596 P.2d 129 (1979); *State v. White & Stewart*, 225 Kan. 87, 587 P.2d 1259 (1978); *State v. McCor-*

*gary*, 224 Kan. 677, 681, 585 P.2d 1024 (1978); *State v. Martinez*, 223 Kan. 536, 537, 575 P.2d 30 (1978).

An argument similar to that advanced here by the appellant was rejected by this court in *State v. Soles*, 224 Kan. 698, 585 P.2d 1032 (1978), where we said:

"In view of defendant's insanity defense, it was necessary for the State to prove defendant acted knowingly and with premeditation in order to prove its case in chief. Photographs offered to prove the elements of the crime, the fact and manner of death, the violent nature of the death, and to corroborate the testimony of other witnesses are relevant and admissible." 224 Kan. at 701.

In *Soles*, the facts of the crime were actually stipulated in advance of trial; here, there was no such stipulation. The State had the burden to prove its case beyond a reasonable doubt, and the jury was given the option of finding the defendant guilty, not guilty, or not guilty by reason of insanity. The defendant did not stipulate as to the manner of death, or that the bones were those of the victim.

Dr. Schneider's testimony also corroborated certain details of the defendant's confession. The remains had characteristics suggesting that the body was partially decomposed at the time it was burned, and that it had been moved around in the fire as it was burned. The jury could see the effects of the fire on the bone as described by the witness.

While the bones and the photographs of them might be said to be gruesome, neither the photographs nor the bones are particularly inflammatory or gory. They were utilized by the expert witnesses, and were an essential part of the State's case. It was not error to receive this evidence, and to allow the expert to refer to it while testifying about the identification process and the post-mortem treatment of the remains.

Finally, defendant contends that the trial court erred in refusing to grant a mistrial because of prejudicial testimony, a prejudicial news headline, and prosecutorial misconduct during closing arguments.

K.S.A. 22-3423(1)(c) provides that a trial court may terminate the trial and order a mistrial at any time it finds a termination is necessary because of prejudicial conduct, in or outside the courtroom, which makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution. The declaration of a mistrial is a matter which lies within the trial court's sound discretion. That discretion is abused only where no reasonable person would take the view adopted by the court; if

reasonable people could differ as to the propriety of the action taken by the court, then it cannot be said that the trial court abused its discretion. *State v. Falke,* 237 Kan. 668, 679-80, 703 P.2d 1362 (1985). To warrant the declaration of a mistrial, the rights of the defendant or the State must be substantially prejudiced. Abuse of discretion must be clearly shown before an appellate court will set aside the trial court's decision. *State v. Ferguson, Washington & Tucker,* 228 Kan. 522, 527-28, 618 P.2d 1186 (1980).

Defendant first argues that a mistrial should have been declared based upon prejudicial hearsay included within the testimony of Sabrenne Fullman. Defendant filed a motion in limine regarding Fullman's proposed testimony, and her testimony was first heard outside the hearing of the jury. At that time she testified that Barber called her in mid-June. He sounded afraid, and asked her to take him to a motel because a lady staying with him was going to kill him because he would not give her $1,000. Fullman initially testified that Barber did not say when the threat occurred. The court ruled the testimony was admissible under K.S.A. 1985 Supp. 60-460(d)(3), finding that Barber was describing a recently perceived event because of the frightened tone in his voice. The trial court overruled the motion in limine.

In the presence of the jury, Fullman's testimony was substantially the same except she added that Barber told her the woman tried to kill him around the first of June. Because this was not recently perceived by the declarant, it was not within the hearsay exception. On motion of the defense, agreed to by the prosecution, the judge struck all of Fullman's testimony and ordered the jury to disregard it. He denied a defense request for a mistrial. In a later inquiry, outside the hearing of the jury, Fullman testified that Barber told her the *threat* on his life occurred earlier the same day. The judge then denied a renewed motion for mistrial, stating that he felt Fullman's testimony was admissible under 60-460(d)(3) but that he struck it because the State so agreed.

We are not called upon to determine whether or not the testimony was admissible, but in ruling upon the motion we assume that the testimony, at least that concerning the attempt on Barber's life which occurred about June 1, was not admissible. We conclude that the trial court's admonition to the jury to

disregard all of Fullman's testimony cures the improper admission of evidence under the facts of this case. A declaration of mistrial is not warranted unless the defendant has been substantially prejudiced. Here, Hollis confessed to the crime in considerable detail; many of those details were substantiated by other evidence. The State's case was not weak, but very strong. We hold that the trial judge did not abuse his discretion in refusing to grant a mistrial on the basis of the Fullman testimony.

Appellant next claims that the trial court should have granted a mistrial because the jurors were not specifically asked if they had seen a headline in a Wichita paper during trial which read "Defense termed 'marginal'—judge questions Hollis' claims." When the headline was brought to the trial judge's attention, he asked the jurors if any of them had read anything about this case in that morning's paper. There was no response. Appellant now argues that the trial court should have gone further and should have asked the jurors if they had seen the headline. There is no showing on the record that any of the jurors saw the headline. We find no error.

Finally, appellant claims the trial court erred in failing to grant a mistrial because of four statements made by the prosecutor during closing argument. Defense counsel objected to each of the statements. The trial court sustained each objection and admonished the jury to disregard statements of counsel that were not supported by the evidence. The trial court overruled the mistrial motion, stating that the admonitions were adequate.

What we said in *State v. Pursley*, 238 Kan. 253, 265, 710 P.2d 1231 (1985), is equally applicable here:

"The trial court promptly recognized the objectionable aspects of the prosecutor's statements. This prompt action by the trial court cured any possible prejudice to the defendant. In this connection we stated in *State v. Warbritton*, 215 Kan. 534, Syl. ¶ 1, 527 P.2d 1050 (1974), and reiterated in *State v. Perales*, 220 Kan. 777, 780, 556 P.2d 172 (1976), the following:

" 'Improper remarks made by the prosecuting attorney in his summation to the jury will not provide a basis for reversal where the jury has been instructed to disregard the same, unless the remarks were so prejudicial as to be incurable.'

"See also *State v. Johnson*, 229 Kan. 42, 45-46, 621 P.2d 992 (1981); *State v. Mick*, 229 Kan. 157, Syl. ¶ 3, 621 P.2d 1006 (1981).

"Moreover, due to the overwhelming evidence against the defendant in this case, there is little likelihood the absence of the errors would have changed the outcome of the case, and, as such, the errors were harmless. *State v. Folkerts*, 229 Kan. 608, 629 P.2d 173, *cert. denied* 454 U.S. 1125 (1981)."

The remarks of counsel here were not so prejudicial as to be incurable, and in light of the strength of the State's case these statements were harmless error, promptly and appropriately handled by the trial court. As the *Perales* court said, "[T]here is little likelihood the absence of the errors would have changed the outcome of the case." The trial court did not err in refusing to grant a mistrial.

The judgment is affirmed.

ALLEGRUCCI, J., not participating.

LOCKETT, J., concurring and dissenting: I concur with the reasoning of the majority opinion on all issues except the finding that the defendant's Sixth Amendment right to effective assistance of counsel was not violated.

After police officers had made their preliminary investigation at Barber's home and obtained a statement from Hollis, Detective Gilmore was called to investigate the case. Detective Gilmore had a conversation with Hollis. Hollis again stated that Barber was "drying out" in a VA hospital. Detective Gilmore then drove Hollis to the courthouse for further questioning. En route to the courthouse, and while they were having a general conversation about world problems, Hollis blurted out that she had killed the old man. Later, Detective Gilmore obtained a detailed statement from Hollis. Detective Gilmore followed the proper procedure when he obtained the statement.

On August 2, Hollis made a second request by note asking Detective Gilmore to bring her more cigarettes. After Gilmore gave her the cigarettes, Hollis informed Gilmore that her attorney had advised her not to answer any of the officer's questions. She then volunteered that she was to plead insanity. Detective Gilmore asked if she was insane. Hollis responded that she was not insane.

The majority opinion states, "The officer's natural response was his question as to whether or not she was having mental problems." I agree that it was a natural response for a detective who had been assigned to investigate the case to determine if the defendant was insane. Detective Gilmore was neither a concerned friend nor a casual acquaintance worried about Hollis' mental health. He was a detective. His duty was to obtain

information useful to the prosecutor and report those findings to him. He performed his duty.

The Sixth Amendment provides that the accused shall enjoy the right "to have the Assistance of Counsel for his defense." This right is meant to assure fairness in the adversary criminal process. *Gideon v. Wainwright*, 372 U.S. 335, 344, 9 L. Ed. 2d 799, 83 S. Ct. 792 (1963). Where a defendant demonstrates prejudice to the ability of her counsel to provide adequate representation in a criminal proceeding, appropriate action must be taken. *United States v. Morrison*, 449 U.S. 361, 66 L. Ed. 2d 564, 101 S. Ct. 665 (1980).

Here, Hollis has demonstrated prejudice to the ability of her counsel to provide an effective defense of insanity in the criminal proceeding. Her response to Detective Gilmore's question regarding her sanity was effectively used by the prosecution against her defense of insanity.

The trial judge correctly determined that Hollis' rights had been violated by the State. He incorrectly allowed the statement to be used as rebuttal evidence against the insanity defense of Hollis. Hollis should be granted a new trial.

PRAGER and HOLMES, JJ., join in the foregoing concurring and dissenting opinion.