No. 64,213

In the Matter of the Estate of DELBERT P. HENDRICKSON, Deceased.

(805 P.2d 20)

Opinion filed January 18, 1991.

*Steven W. Rogers,* of Rogers Law Office, of Fredonia, argued the cause and was on the brief for appellant Ruby M. Hendrickson.

*John J. Gillett,* of Fredonia, argued the cause and was on the brief for appellees Gene R. Hendrickson and Judy L. Martin.

The opinion of the court was delivered by

McFARLAND, J.: Ruby M. Hendrickson filed proceedings to probate the estate of her deceased common-law husband, Delbert P. Hendrickson. Decedent's children, Gene R. Hendrickson and Judy L. Martin, contested Ruby's status as the widow of the decedent. The magistrate court held in favor of Ruby. The district court, on appeal, held Ruby had failed to carry her burden of

proof to establish the existence of the common-law marriage. The Court of Appeals affirmed the district court in an unpublished opinion filed May 25, 1990. The matter is before us on petition for review.

The three elements of common-law marriage are: (1) capacity of the parties to marry; (2) present marriage agreement between the parties; and (3) a holding out of each other as husband and wife to the public. *Eaton v. Johnston*, 235 Kan. 323, Syl. ¶ 1, 681 P.2d 606 (1984). Capacity to marry relates to whether or not a legal impediment exists to entering into a marriage contract. Accordingly, the term "capacity to marry" involves such diverse matters as mental or physical capacity, the absence of a spouse, whether a marriage would be incestuous, and the party being of sufficient age to marry. See generally 52 Am. Jur. 2d, Marriage § 14 *et seq.* In the case before us, the only issue is whether or not the decedent had sufficient mental capacity to enter into a common-law marriage.

The facts may be summarized as follows. Delbert Hendrickson was born in 1915. In 1939 he married his first wife, Irene. In 1944, he was discharged from the United States Army with a 50% disability rating. The reason for the resultant disability pension was either a "nervous breakdown" or "back problems." The son, Gene, testified he believed the former version; Ruby testified Delbert told her the latter version. No official records were introduced into evidence. Three children were born to the marriage, Gene, Judy, and Rodney.

Delbert was a poor provider, and the family had many financial problems. Delbert had various hospitalizations. Gene testified he understood the cause was mental illness. In 1968, Delbert's disability pension was increased to reflect 100% disability. Irene was, during her married life, the stabilizing spouse and manager of the family. She had to perform this role quietly and indirectly, or Delbert would become angry. In December 1987, Irene died.

About 1981, the younger son, Rodney, was killed in a truck accident. His parents received about $100,000 from litigation over the loss of Rodney. During the period of time at issue herein (1988), about $50,000 and a small farm near Neodesha remained. The two remaining children were married adults and lived some distance from Delbert, who stayed on the farm. Delbert would

have problems from time to time managing his finances and Gene would straighten out the problems.

In March of 1988, Ruby and Delbert met through Ruby's son. This son had an interest in horses and would go to Delbert's farm to ride. Ruby started accompanying the son to the farm and began helping Delbert. Ruby was 55 years old and Delbert was 73. Commencing in July 1988, Ruby would spend some nights on the farm. There was considerable testimony that the two discussed marriage, and that Delbert wanted to marry Ruby.

During this summer, heart disease became a problem for Delbert and this required treatment at the Veterans Administration (V.A.) hospital in Wichita. He was hospitalized various times during that summer and fall. Ruby was involved in making the arrangements and providing the transportation. In November 1988, Delbert returned to the Wichita V.A. hospital. His condition was poor and he was transferred to the V.A. hospital in Oklahoma City where more specialized treatment was available.

A staff member of the V.A. hospital telephoned Ruby, in late November 1988, requesting that she come and see Delbert. She was advised Delbert was going to die. Ruby had no private transportation and arrived by bus late at night on November 23, 1988. The V.A. hospital had quarters ready for her at its "Hospitality House." The following morning, Thanksgiving, Ruby went to the hospital. Delbert's physician and a nurse accompanied her to Delbert's room. Ruby testified that, in the presence of these staff members, Delbert asked her to marry him yet that day and she agreed. Delbert looked quite ill and was wearing an oxygen mask. Shortly thereafter, the hospital chaplain arrived and asked if the wedding was on. Hospital staff advised the media and at 1:00 p.m. that day the chaplain performed the ceremony—designated as a common-law marriage at the time as there was no marriage license. Local newspapers and a television station granted coverage due to the human interest angle of the story. Introduced into evidence was a copy of the brief film clip used by the television station on its evening news show. The couple is portrayed sitting on the edge of Delbert's bed. Delbert is smiling and holding Ruby's hand. He then removes his oxygen mask and kisses Ruby. Later that day, Ruby telephoned Delbert's children

to tell them of the marriage (Delbert did not have a telephone in his room).

Ruby moved into Delbert's hospital room. On December 3, 1988, Delbert was discharged and the V.A. hospital staff took the couple back to Ruby's home in Fredonia. Delbert's son, Gene, and his son-in-law, Lornell Martin, testified that Delbert telephoned them shortly after his arrival in Fredonia. He told them things happened so fast he did not realize what was going on. This testimony is rather unclear as to whether Delbert was referring to the wedding or the theft of money from Ruby in a purse snatch at the hospital.

Delbert's condition deteriorated and he was rehospitalized in Wichita where he died on December 12, 1988. He had resided in Fredonia approximately one week.

Preliminarily, some comment needs to be made as to which state's law applies. The marriage occurred in Oklahoma. The validity of the marriage should be determined under that state's law. Oklahoma recognizes common-law marriage. See *In re Sanders Estate*, 67 Okla. 3, 168 Pac. 197 (1917). The parties have presented no research to us on the requirements for a valid common-law marriage in Oklahoma. Apparently, they are satisfied that Kansas and Oklahoma have identical applicable law in this area. Our limited research has not disclosed any differences in the subject area which are pertinent herein. The parties argue Kansas law in support of their respective positions. We will, under these circumstances, decide the matter as though the marriage had occurred in Kansas.

What is meant by the term mental capacity to marry? In *Baughman v. Baughman*, 32 Kan. 538, Syl. ¶ 5, 4 Pac. 1003 (1884), this court held:

"In order to avoid a contract of marriage on the ground of mental unsoundness, the party alleged to be insane or *non compos mentis* must be incapable of understanding the nature of the contract itself. Mere imbecility or weakness of mind, caused by disease or otherwise, will not be, when unaccompanied by circumstances showing it has been taken advantage of, a sufficient ground for avoiding such a contract. If the powers of the mind of the person alleged to be *non compos mentis* have been so far affected by disease or the decay of his faculties as to render him incapable of knowing the effect of the act he is about to perform, and of intelligently consenting to the marriage ceremony, then there is an incapacity on his part to contract.

On the other hand, even if his understanding be weak, still, if the capacity of his mind remains to see things at the time in their true relations, and to form correct conclusions, the contract of marriage will be valid, in the absence of fraud or imposition."

The facts herein preclude any possibility that Ruby pressured Delbert into marrying her. If anybody took advantage of Delbert's condition, it was Delbert. Ruby was requested by a hospital staff member (either Delbert's physician or a social worker) to journey to Oklahoma to visit Delbert, as the hospital believed Delbert was dying. She arrived by bus in the middle of the night and, the following morning, was taken by Delbert's physician to see him. Delbert asked her to marry him, the ceremony to be later that day. Inferentially, the wedding machinery was already in gear when Ruby arrived in Delbert's room. This may well have been perceived by Ruby as a dying man's last request. Ruby was certainly under pressure to agree.

"The test of mental capacity to contract is whether the person possesses sufficient mind to understand in a reasonable manner the nature and effect of the act in which he is engaged." *DeBauge Bros., Inc. v. Whitsitt,* 212 Kan. 758, 762, 512 P.2d 487 (1973). As related to the degree of mental capacity required to contract a marriage, there is a split of authority on whether the same degree of mental capacity necessary for entering into an ordinary contract is required or whether a lesser degree will suffice. See Annot., Mental Capacity to Marry, 82 A.L.R.2d 1040, §§ 3-4. The test for mental capacity previously cited herein from *Baughman v. Baughman* is so archaic in language that it should be modernized. We adopt the test quoted in the above A.L.R. 2d citation at 1044, which itself was taken from *Johnson v. Johnson,* 104 N.W.2d 8 (N.D. 1960), as follows:

" '[T]he best accepted test as to whether there is a mental capacity sufficient to contract a valid marriage is whether there is a capacity to understand the nature of the contract and the duties and responsibilities which it creates.' "

As noted by the trial court, it is unfortunate that in this unusual case where medical professionals were involved in the whole scenario, including attendance at the ceremony, that these people gave no testimony. Likewise, the testimony of the chaplain and the media people present would have been very pertinent. For

whatever reason, the facts known by these people and the relevant medical opinions were not available to the trial court and are not before us. The only testimony as to what transpired in Oklahoma City on the crucial day is that of Ruby. Plus, we have the brief television film clip. The film contains no audio of the couple's words.

The matter of who has the burden of proof is determinative herein. The trial court and the Court of Appeals placed the burden of proving mental capacity upon Ruby, in reliance upon *Driscoll v. Driscoll*, 220 Kan. 225, 227, 552 P.2d 629 (1976), wherein we said:

"The burden of proving a common-law or consensual marriage rests upon the party asserting it."

*Driscoll* was a divorce action. There was no issue of mental capacity in *Driscoll*. As a general statement of law, the citation from *Driscoll* is sound. However, on the issue of mental capacity another element comes into play. In Kansas there is a presumption of sanity and competency which cuts a path through many areas of the law. See *State v. Hollis*, 240 Kan. 521, Syl. ¶ 3, 731 P.2d 260 (1987), wherein we stated:

"There is a presumption of sanity in a criminal proceeding that may be relied upon by the prosecution to establish a prima facie case."

Also, PIK Civ. 2d 15.61, dealing with adjudication of an incapacitated person, provides in part:

"A person is presumed to be competent, but that presumption is overcome if the evidence establishes that the person is incapacitated."

We adopt the following statement from Annot., Mental Capacity to Marry, 82 A.L.R.2d § 9, p. 1053:

"The general presumption is that a person who has contracted a marriage was mentally capable of contracting it, and the burden is on the party alleging mental incapacity to prove it."

Certainly, there are sound practical reasons for the presumption of sanity, competency, and capacity. A high percentage of all litigation involves attempts to hold persons accountable for alleged wrongful acts or omissions. If the party seeking such accountability had to prove in his or her case in chief that the other party

was sane, competent, or had capacity (depending on the type of litigation ·involved), the burden would be insurmountable.

The burden of proof was crucial to the district court's determination herein as shown by the following excerpt from its memorandum. opinion:

. "There seems to be little, if any, truly impartial·evidence on the question of Mr. Hendrickson's legal capacity. The battle lines were drawn between Ruby M. Baker/Hendrickson on the one hand and Mr. Hendrickson's children on the other. Each presented testimony which, predictably, favored their respective contentions. Each side presented corroborating testimony, again heavily slanted toward their respective positions. There is little doubt of Mr. Hendrickson's frail health in the last year of his life, and I am persuaded by the evidence of his diminished mental abilities over the years. However, none of the evidence presented made it clear whether he was or was not capable of entering into an agreement. I then find myself wondering about the lack of evidence, which should have been readily available, from attending doctors or nurses as to his capacity. I realize that I can't speculate as to what that evidence might or might not have shown.

"In the final analysis, I go back to the burden of proof. Ruby M. Baker/ Hendrickson, by law, was in the position of having to prove her claim of capacity on the part of Mr. Hendrickson was more probably true than untrue. This she did not do. Accordingly, not all of the requirements were met for a valid common-law marriage, and Ruby M. Baker/Hendrickson, as a matter of law, is not the surviving spouse of Delbert M. Hendrickson."

We are not unmindful of our statements in *Eaton v. Johnston*, 235 Kan. 323, 324, 681 P.2d 606 (1984), wherein we stated:

" 'In considering whether reversible error was committed·in finding that a common-law marriage did not exist, several long-standing rules of appellate review are to be taken into account. A district court judgment is presumed valid and will not be set aside absent an affirmative showing of error by the appellant. [Citation omitted.] A finding that a party has not sustained its requisite burden will not be disturbed absent an arbitrary disregard of undisputed evidence. [Citation omitted.] Because of the trial court's advantageous position, the appellate court does not retry disputed factual issues nor pass on the credibility of witnesses and the weight to be given each piece of testimony. [Citations omitted.]' "

In the case before us, the trial court clearly stated in its conclusion that neither party had satisfactorily proved their respective claims as to capacity. Under these circumstances, whoever had the ·burden of proof necessarily loses. We conclude the trial court erred in not applying the presumption of capacity and not placing the burden of proof on those claiming incapacity to rebut that

presumption. This presumption, plus Ruby's evidence in support of capacity and the trial court's comments, requires reversal of the judgment herein and an entry of judgment holding that a valid common-law marriage existed between Delbert and Ruby.

The judgment of the Court of Appeals is reversed. The judgment of the district court is reversed. Judgment is entered in favor of appellant, and the case is remanded to the district court for further proceedings consistent with this opinion.

ABBOTT, J., not participating.