No. 62,485

STATE OF KANSAS, *Appellee,* v. RANDY D. PIOLETTI, *Appellant.*

(785 P.2d 963)

Opinion filed January 19, 1990.

*Karen E. Mayberry,* assistant appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with her on the brief for appellant.

*Debra S. Byrd*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Robert T. Stephen*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

MCFARLAND, J.: Randy D. Pioletti appeals his jury trial convictions of aggravated kidnapping (K.S.A. 21-3421) and first-degree murder (K.S.A. 21-3401).

The facts of this bizarre homicide may be summarized as follows. Karen Baile and Randy D. Pioletti were married in December 1984. A daughter, Rhyannon, was born in May of 1985. The marriage ended in a December 1987 divorce. Custody of Rhyannon was a bitter ongoing problem between her parents. In the fall of 1987, Randy told a friend, Mary Kessinger, he knew how to permanently resolve the problem. He stated he could "grab" Karen, put her in his van, take her to the mortuary where he worked, and cremate her. He made similar statements to other people. He also stated that if he did this, he wanted Karen to feel it.

On December 6, 1987, Randy made arrangements to meet Karen at Willie C's, a restaurant near the Wichita Towne East Mall, on the following evening. The stated reason for the meeting was a joint Christmas shopping expedition for Rhyannon and Karen's two children from a previous marriage.

At 6:30 p.m. on December 7, 1987, Randy left work at the mortuary after asking a co-worker to cover for him for a couple of hours for the stated reason he wanted to buy his daughter a Christmas present. Karen left her home at 6:10 p.m., telling the baby-sitter she would be back at 10:00 p.m. She never returned. Randy returned to work at 8:00 p.m. He appeared to be nervous and had abrasions on his face and left hand. Randy stated he had injured himself on his van door.

The next morning a co-worker at the mortuary saw Randy mopping near the crematory. He also noticed the crematory was hot, although there was no scheduled usage thereof. Randy pointed to the crematory and indicated he had cremated his dog. Later that morning, Randy went to Mary Kessinger's house and asked her to wash some coveralls for him. He also requested and received permission to put a bucket of rags in an outbuilding on

her property. Shortly after Randy left, he called Mary stating: Karen had disappeared, he was in trouble, and the police were looking for him. He also indicated he had burned a puppy in the crematory and was in difficulty at work because of it. After Randy hung up, Mary started thinking about Randy's odd conduct that morning, his telephone call, and his prior threat to kill and cremate Karen. She went to the outbuilding and found a bucket containing cloth and ashes hidden therein. She called the police.

The bucket contained ashes, bones, pieces of flesh, teeth, sheets, paper towels, plastic, coins, a paper clip, a safety pin, gold chain, a makeup purse frame with clasp, aluminum tubing, a cigarette butt, a gold necklace fob with a clear stone, and glass. Analysis of the biological material revealed that the remains were that of a female with the following characteristics: (1) of European descent; (2) 5'2"; (3) approximately 32 years old; (4) had given birth within the last five years; (5) had a broken nose; and (6) had type O blood. Karen Baile was a 5'2" white female, 32 years old with type O blood and a broken nose, and who had last given birth in May 1985. The necklace found in the bucket was identified as belonging to Karen. DNA analysis introduced at trial indicated that blood found on the door of the crematory was probably that of the offspring of Bryon and Delphina Baile, Karen's parents. The test indicated a 99.999% probability of parenthood. On December 8, 1987, Karen's automobile was found in the parking lot of Willie C's restaurant.

On December 10, 1987, Randy was charged with premeditated first-degree murder. Following a preliminary hearing, he was bound over on first-degree murder and aggravated kidnapping charges. The information was amended to reflect these charges.

On May 12, 1988, defendant was convicted of first-degree murder and aggravated kidnapping. He was sentenced to consecutive life terms. The matter is before us on Randy's direct appeal. Other facts will be stated as necessary for discussion of the particular issues.

## VOIR DIRE

Defendant complains herein of a number of what he contends were judicial improprieties committed during voir dire. Preliminarily, we must set the stage. The prospective jurors were divided into three groups of twelve, each of which was questioned

separately, but in the presence of the others. Defendant had previously filed a notice of intent to rely upon an insanity defense. During voir dire examination of the first panel the matter of the insanity defense was raised, and the panel was asked if any person could not follow the judge's instructions or not fairly consider the evidence thereon. There were no affirmative responses. Later on, when a prospective juror on the same panel was being examined, the individual expressed some doubt as to what the law on insanity was. The trial judge, over defendant's objections, responded as follows:

"I don't know that its going to come up in the case, but there is no reason for the jury to have any questions about the law of insanity. This is the law of insanity.

'Insanity, to constitute a legal defense to the charge of crime, means that the defendant is laboring under such a defect of reason from disease of the mind as to not to know the nature and quality of the act he is doing, or, if he did know it, that he did not know that what he was doing was wrong because of his mental inability to distinguish between right and wrong, and if these facts exist, then the law does not hold him responsible for his act. On the other hand, if a defendant is mentally capable of understanding what he is doing and has the power to know that his act was wrong, then the law will hold him criminally responsible for it. If this power of discrimination existed, he was sane in the eyes of the law. A person of sound mind and discretion will not be exempted from punishment because he might have been a person of weak intellect or one whose moral perceptions were blunted or ill developed, or because his mind may have been depressed or distracted from brooding over misfortunes or disappointments, or because he may have been wrapped up to the greatest and most intense mental excitement from sentiments of disappointment, rage, revenge, or anger. The law recognizes no form of insanity, although the mental faculties may be disordered or deranged, which will furnish one immunity from punishment for an act declared by the law to be criminal, so long as the person committing the act had the capacity to know what he was doing and the power to know that his act was wrong.'

"Now, that's the law of insanity in Kansas. If that is a defense asserted, then that will be your instruction. There will be other instructions. The reason I am doing that is because both sides saw fit to go into that on voir dire. I don't even know if there will be any evidence in that regard. If there isn't, you won't get an instruction on that. That's why I would like to caution you, we can't expect members of the jury to speculate about matters that may not be in issue, but every time a jury raises a question, I am going to answer it. That's why I read it. You will have that in writing if that is a defense asserted."

The instruction read by the trial judge was from *State v. Andrews*, 187 Kan. 458, 357 P.2d 739 (1960), *cert. denied* 368 U.S. 868 (1961).

As voir dire progressed, the subject matters of insanity and expert testimony thereon continued to surface. Each time, the trial court launched anew into the subject with increasingly maundering responses. Finally, the following occurred:

"THE COURT: We have gotten into something [insanity issue] that may be purely speculative. It will be time to instruct when it becomes an issue in the case. We are getting farther and farther into it and we are going to back out. That's the only thing I know to do.

"I am not trying to put Mr. Stahl [defense counsel]—

"MS. SWEGLE [attorney for State]: I would like to note my objection to—

"THE COURT: We are going to leave that out until we know that's going to be the defense.

"MS. SWEGLE: That Notice has been filed; we are entitled to go into it.

"THE COURT: Let me put it this way: You have gone into it at great length, both of you. The subject matter is exhausted, period.

"MR. STAHL: Is Your Honor saying the next panel is not going into that?

"THE COURT: If you want to ask people if they will disregard those, you are welcome to do so, but—Do any of the other twelve people that obviously have heard all of this have any questions to raise at this time about the insanity defense, should it be raised in the case?

"(No response.)

"THE COURT: Okay, nobody has any. I am just trying to get this thing in proportion. Let's proceed."

At the conclusion of the voir dire questioning, defense counsel moved for a declaration of mistrial based upon the judge's comments during and conduct of the voir dire. The trial judge's comments (out of the presence of the jury) in overruling the motion are too lengthy for in toto inclusion herein and include much irrelevant material, such as his low personal opinion on the value of expert witnesses on insanity issues. The judge concluded his remarks as follows:

"The reason I called a halt to all this final argument that was going on about the insanity defense is, I just was confronted with the fact that it hadn't even been decided by the defense or diclosed, pardon me, disclosed to the Court whether that defense is going to be used. If it wasn't going to be used, none of the discussion about insanity was appropriate. And if

you choose not to use it, there won't be any instruction on it. And it won't be before the jury."

Defense counsel's complaints relative to alleged judicial impropriety during voir dire fall into two categories:

1. Improper statements of the applicable law; and
2. improper restriction of inquiry on voir dire.

K.S.A. 22-3408(3) provides:

"The prosecuting attorney and the defendant or his attorney shall conduct the examination of prospective jurors. The court may conduct an additional examination. The court may limit the examination by the defendant, his attorney or the prosecuting attorney if the court believes such examination to be harassment, is causing unnecessary delay or serves no useful purpose."

In *State v. Jackson*, 234 Kan. 84, 86, 670 P.2d 1327 (1983), we stated the rule concerning the limitation of voir dire examination of the jury as follows:

"A trial court has a broad discretion in controlling the voir dire examination in criminal cases. In the absence of a showing of an abuse of discretion and prejudice, the rulings of a trial court limiting a defendant's voir dire examination of jurors will not be made the basis for a reversal of a case. [Citation omitted.]"

See also *State v. Mahkuk*, 220 Kan. 74, 77, 551 P.2d 869 (1976).

Here, the trial court limited the voir dire examination of the jury only after an extensive discussion of the various ramifications of an insanity defense had occurred. The trial court considered further discussion unnecessary in view of the discussion which had taken place with the first two jury panels *and* in the presence of the third panel. Moreover, before closing off the subject, he asked the remaining panel if they had any questions concerning the insanity defense. There were no questions. The court also told defense counsel that he could question the remaining jury panel about whether they would disregard insanity instructions. Defense counsel *did* question the prospective jurors from the third jury panel on whether there was anything that might keep them from being fair and impartial jurors.

We have carefully reviewed the entire record of the voir dire and unhesitatingly conclude:

1. No reversible misstatements of the applicable law as to insanity and expert witnesses thereon were made by the trial court;

2. the complained-of limitation of voir dire as to the insanity defense relative to the third panel was not an abuse of discretion and not prejudicial to the defendant;

3. the voir dire was not well handled by the trial court and was characterized by rambling, repetitive judicial statements that should not have been made; and

4. individually and collectively, no reversible error or prejudice to the defendant has been shown.

## INSTRUCTIONS

The unnumbered instruction defining legal insanity given at the close of the evidence was the same as that set forth in the preceding issue and will not be repeated herein. As previously stated, it is taken from *State v. Andrews*, 187 Kan. 458, wherein it was approved. Particularly, defendant complains that it was error not to define the word "wrong."

In *State v. Boan*, 235 Kan. 800, Syl. ¶ 2, 686 P.2d 160 (1984), we held:

"Under the *M'Naghten* test for criminal insanity, the accused is to be held not criminally responsible (1) where he does not know the nature and quality of his act, or, in the alternative, (2) where he does not know right from wrong with respect to that act."

"Wrong," as used in the *M'Naghten* test, was defined as " 'that which is prohibited by the law of the land.' " 235 Kan. at 810. We further stated that the PIK instruction on insanity would be clearer to the jury if language defining the word "wrong" were added to the instruction. However, the lack of definition did not cause this court to declare the giving of the PIK instruction to be erroneous or overrule the instruction used in *State v. Andrews*, 187 Kan. 458. 235 Kan. at 814.

PIK Crim. 2d 54.10 was amended in response to the *Boan* opinion and now reads:

"The defendant has denied criminal responsibility because of lack of mental capacity at the time the offense was committed. In law, this is called insanity. The defendant is not criminally responsible for his acts if because of mental illness or defect, he lacked the capacity either

(a) to understand the nature of his acts, or

(b) to understand that what he was doing was prohibited by law.

"If you have a reasonable doubt as to his capacity to understand either, then you should find the defendant not guilty because of insanity.

"If you have no reasonable doubt that the defendant had the mental capacity at the time of the alleged offense to understand both what he was doing and that it was prohibited by law, then you should find the defendant was not insane."

Defense counsel's request to use this PIK instruction was denied. *Boan* involved an unusual factual situation wherein defendant claimed to believe the killings he committed were morally right—hence the trial court's modification of the instruction from a right and wrong test to a contrary to law test. We held:

"Under the *M'Naghten* test for criminal insanity, the accused is to be held not criminally responsible (1) where he does not know the nature and quality of his act, or, in the alternative, (2) where he does not know right from wrong with respect to that act." 235 Kan. 800, Syl. ¶ 2.

"Under the 'right and wrong' test of criminal insanity, it must be proved that at the material time the accused did not know that what he was doing was contrary to law. It is not sufficient to prove that he believed that, while what he was doing was legally wrong, it was morally right." 235 Kan. 800, Syl. ¶ 3.

No such claim is made herein. Defendant's attempts to conceal the crime were planned in advance and his conduct afterward clearly showed an awareness that the killing was prohibited by law. We find no reversible error in this instruction.

Next, defendant claims error in the following unnumbered instruction:

"Defendant has claimed as a defense, insanity.

"All persons are assumed to be sane unless the contrary appears from the facts and circumstances in the case.

"If, upon consideration of the whole evidence, the defense asserted causes the jury to have a reasonable doubt as to defendant's sanity at the time of the occurrence, the defendant should be found not guilty by reason of insanity."

Defendant contends this instruction impermissibly shifted the burden of proof to him.

In *State v. Hollis*, 240 Kan. 521, 731 P.2d 260 (1987), we discussed the burden of proof as follows:

" '[T]he state is not required in the first instance to introduce evidence to prove sanity, for the law presumes that all persons are sane, and this presumption of sanity takes the place of evidence in the first instance. It answers for evidence of sanity on the part of the state. But if evidence is introduced which tends to shake this presumption, the jury must then consider the same, and its effect upon the main issue of guilty or not guilty,

and if upon considering the whole of the evidence introduced on the trial, together with the presumption of sanity, the presumption of innocence, and all other legal presumptions applicable to the case under the evidence, there should be a reasonable doubt as to whether the defendant is sane or insane, he must be acquitted. . . . [The defendant] is required only to raise a reasonable doubt as to his guilt. The burden of proof is always upon the state, and never shifts from the state to the defendant.' " 240 Kan. at 529 (quoting *State v. Crawford,* 11 Kan. 32, 44-45 [1873]).

The complained-of instruction is poorly worded. The first sentence, "Defendant has claimed as a defense, insanity," is unnecessary. The third paragraph picks up on this sentence as follows:

"If, upon consideration of the whole evidence, *the defense asserted* causes the jury to have a reasonable doubt as to defendant's sanity at the time of the occurrence, the defendant should be found not guilty by reason of insanity." (Emphasis supplied.)

The "defense asserted" is the insanity defense referred to in the first sentence. Reliance on a claim of insanity is generally referred to as the insanity defense both in K.S.A. 22-3219 and in legal terminology. It lacks some of the characteristics of a true affirmative defense as, although notice of intention to rely thereon is required, a person claiming thereunder does not have the burden of proving the insanity.

A related matter comes up again in the following unnumbered instruction:

"Your determination of defendant's claim of insanity must be made from the whole evidence in this case. In that regard, the testimony of persons who observed the events leading up to the transaction you are considering and who observed and described the actions and demeanor of the defendant immediately before, during and after the transaction may be considered by the jury along with the other evidence.

"You are further instructed that the testimony of psychologists and psychiatrists stands on the same footing as that of any other witness since insanity is a legal not a medical concept."

This instruction is not an incorrect statement of the law. As we held in *State v. Sanders,* 225 Kan. 147, Syl. ¶ 4, 587 P.2d 893 (1978):

"The testimony of medical experts that an accused was legally insane at the time of a criminal act is not conclusive merely because it is not disputed by other medical testimony. The testimony of nonexpert witnesses who observed actions of the accused immediately before, during and after the

criminal act may be considered by a jury along with testimony of expert witnesses."

That legal insanity is a legal and not a medical statement is also a true statement. See 21 Am. Jur. 2d, Criminal Law § 49.

PIK Crim. 2d 52.14 recommends no separate instruction on expert witnesses be given.

PIK Crim. 2d 52.09 as follows was given herein:

"It is for you to determine the weight and credit to be given the testimony of each witness. You have a right to use common knowledge and experience in regard to the matter about which a witness has testified."

Did the instructions as a whole impermissibly shift the burden of proof of insanity to the defendant? We believe not. "Insanity defense" is a common term relating to the matter of criminal responsibility and by itself is not a burden shifting term. Another unnumbered instruction given herein provides:

"The law places the burden upon the state to prove the defendant is guilty. The law does not require the defendant to prove defendant is not guilty. Accordingly, you must assume defendant is not guilty unless you are convinced from all the evidence in the case defendant is guilty.

"You should evaluate the evidence admitted in this case in accordance with these instructions. The test you must use is this: If you have no reasonable doubt as to the truth of any of the claims made by the state, you should find the defendant guilty as charged; or if you have a reasonable doubt as to the truth of any of the claims made by the state, you should find the defendant not guilty."

This instruction is quite close to PIK Crim. 2d 52.02 and clearly places the burden of proof as to guilt on the State. We find no reversible error in the instruction herein.

Before turning to the next issue, some additional comments need to be made. The instructions herein were not well done. They lack even the elementary format of being individually numbered, which renders any discussion thereof awkward. More seriously, they are another example of this particular trial judge's long-established conduct of refusing to use PIK instructions or follow PIK recommendations. The pattern instructions have been developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions. They should be the starting point in the preparation of any set of jury instructions. If the particular facts in a given case require modification of the ap-

plicable pattern instruction or the addition of some instruction not included in PIK, the trial court should not hesitate to make such modification or addition. However, absent such need, PIK instructions and recommendations should be followed. Each of the complaints herein as to instructions given would have been avoided if PIK had been followed. It is difficult to conceive of what motivation lies behind this trial judge's persistence in creating problems by refusing to follow PIK. Whatever his reason may be, we trust the practice will be discontinued.

## DIMINISHED CAPACITY

The trial court declined to give an instruction on diminished capacity after the same was requested by defense counsel. Defendant contends this was error.

In *State v. Jackson*, 238 Kan. 793, 714 P.2d 1368, *cert. denied* 479 U.S. 821 (1986), we discussed the doctrine of diminished capacity in some depth.

"Evidence of diminished capacity is admissible only for the limited purpose of negating specific intent and is not a substitute for a plea of insanity. Where insanity is relied upon, the jury must first determine that issue. If it finds the defendant sane, it may then consider, where appropriate, evidence of diminished capacity as a defense to a crime requiring proof of a specific intent. Whether the jury should be instructrd on diminished capacity is left to the sound discretion of the trial court." 238 Kan. at 798.

In *State v. Maas*, 242 Kan. 44, 744 P.2d 1222 (1987), we approved our prior holding in *Jackson* that the decision of whether or not to give an instruction on diminished capacity was a matter of judicial discretion, but stated:

"However, a majority of the court is of the opinion that it would be better practice for the trial court to give an instruction on diminished capacity where such an instruction is reasonably necessary to inform the jury of the effect of a defendant's diminished capacity on the specific intent required for the crime charged." 242 Kan. at 52.

In *State v. Morris*, 244 Kan. 22, 765 P.2d 1120 (1988), we followed the holdings of *Maas* and *Jackson* and again held that the giving of the instruction is a matter of judicial discretion. We adhere thereto. We find no abuse of discretion on this issue.

## AGGRAVATED KIDNAPPING CHARGE

On December 10, 1987, defendant was charged with premeditated first-degree murder. A preliminary hearing was had in

January wherein defendant was bound over on the murder charge and aggravated kidnapping. The information was subsequently amended to add the additional charge. Defendant sought dismissal of the new charge, and his motion was denied.

Defendant contends the trial court erred in denying the pretrial motion to dismiss, arguing: (1) the trial judge exceeded his judicial power in binding defendant over on a charge of aggravated kidnapping where he had not been charged with same; (2) defendant was denied a full and fair hearing because he was not permitted to introduce evidence or cross-examine witnesses on the charge of aggravated kidnapping; and (3) there was insufficient evidence to bind the defendant over on a charge of aggravated kidnapping. Each argument will be discussed in sequence.

K.S.A. 22-2902 provides, in part:

"**Preliminary examination.** (1) Every person arrested on a warrant charging a felony or served with a summons charging a felony shall have a right to a preliminary examination before a magistrate, unless such warrant has been issued as a result of an indictment by a grand jury.

. . . .

"(3) The defendant shall not enter a plea at the preliminary examination. The defendant shall be personally present and the witnesses shall be examined in the defendant's presence. The defendant's voluntary absence after the preliminary examination has been begun in the defendant's presence shall not prevent the continuation of the examination. The defendant shall have the right to cross-examine witnesses against the defendant and introduce evidence in the defendant's own behalf. If from the evidence it appears that a felony has been committed and there is probable cause to believe that a felony has been committed by the defendant, the magistrate shall order the defendant bound over to the district judge having jurisdiction to try the case; otherwise, the magistrate shall discharge the defendant."

Defendant considers the statute means the magistrate shall determine if *the felony* (the charged felony) has been committed. The State contends *a felony* means a felony and the magistrate is not limited to just the felony charged.

Kansas has long held that a defendant may be charged with one offense and "bound over for another, if it shall appear on the [preliminary] examination that he is guilty of a public offense other than that charged in the warrant." *Redmond v. State*, 12 Kan. 172, Syl. ¶ 3 (1873). See also *State v. Hill*, 211 Kan. 287, 296, 507 P.2d 342 (1973); *State v. Scott*, 210 Kan. 426, 430, 502

P.2d 753 (1972); *State v. Fields,* 70 Kan. 391, 394-95, 78 Pac. 833 (1904).

The problem with this longstanding rule is that the *Redmond* case, and others following the *Redmond* precedent, came under statutes different from those affecting the case at bar. In *Redmond,* the statutes expressly permitted a defendant to be charged for one offense on an information or warrant, and, if the preliminary hearing produced evidence that the defendant had committed a crime other than the crime charged, he could be held over for trial and given a reasonable opportunity to produce witnesses and prepare his defense. *Redmond,* 12 Kan. at 176; G.S. 1868, ch. 82, § 55. Our present statute, K.S.A. 22-2902(3), makes no reference to charged or uncharged felonies.

Common sense dictates that, had the legislature intended to restrict a magistrate's power to consideration of only a charged felony, it could easily have done so. The term "a felony" contains no such limitation. Defendant's position would often result in multiple preliminary hearings on the same set of facts. The process could continue until the magistrate agreed the State had finally charged the appropriate felony. This would be a particular problem in cases involving sexual crimes against children where there are several closely related felonies in the statute books.

Defendant next argues that he was denied his right of cross-examination of the witness at the preliminary hearing as he did not anticipate a possible aggravated kidnapping charge. There is no showing defendant was precluded or restricted in any way in his cross-examination at the preliminary hearing. We have, in essence, disposed of this issue by our previous holding herein that the magistrate had the power to bind defendant over on the aggravated kidnapping charge.

Finally, defendant argues there was insufficient evidence to bind him over on the aggravated kidnapping charge.

A defendant may be bound over for trial if the court finds there is probable cause to believe that a crime (felony) has been committed and that there is probable cause to believe the defendant committed it. *State v. Burrell,* 237 Kan. 303, Syl. ¶ 1, 699 P.2d 499 (1985). The evidence need not prove guilt beyond a reasonable doubt, only probable cause. *State v. Sherry,* 233 Kan. 920, 935, 667 P.2d 367 (1983). Probable cause at a prelim-

inary hearing signifies evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt. *State v. Puckett*, 240 Kan. 393, 395, 729 P.2d 458 (1986). The trial court must draw the inferences favorable to the prosecution from the evidence presented at the preliminary examination. *State v. Sherry*, 233 Kan. at 935.

To bind defendant over on an aggravated kidnapping charge there must have been evidence from which the trial judge could have reasonably believed that defendant: (1) took or confined the victim by force, threat, or deception; (2) that it was done with the intent to hold her to facilitate the commission of any crime or to inflict bodily harm on the victim; and (3) that bodily harm was inflicted upon the victim. PIK Crim. 2d 56.25; K.S.A. 21-3420; K.S.A. 21-3421.

The evidence presented at the preliminary examination indicted that the defendant had stated he knew the perfect way to "take care" of his ex-wife. He could grab her, put her in his van, take her to the mortuary where he worked, and cremate her. The defendant articulated his plan to several individuals, including Mary Kessinger, with whom he discussed the plan on more than one occasion. Shortly before the victim disappeared, the defendant made arrangements to go Christmas shopping with her. The defendant also made arrangements to take a couple of hours off work for the shopping excursion. The victim and defendant met at the agreed location; however, she never returned from the planned outing. Her automobile was found at the rendezvous scene. The victim's cremated remains were found the next day.

Inasmuch as the victim had intended to go Christmas shopping but ended up at the crematory, it is reasonable to believe she was induced to go there by force, threat, or deception, given the bitter relationship between the parties. If inducing the victim to accompany him by some false statement made by the defendant was part of his plan to commit a crime, the crime of kidnapping by deception would lie. See *State v. Colbert*, 221 Kan. 203, 208-09, 557 P.2d 1235 (1976). Given the facts and circumstances presented at the preliminary hearing, a person could reasonably believe that a taking or confinement occurred to facilitate the crime of murder or to inflict bodily harm upon the victim.

Clearly, there was sufficient evidence to bind the defendant over on the charge of aggravated kidnapping.

We find no error or abuse of discretion in binding the defendant over on aggravated kidnapping.

## FELONY MURDER

The amended information on which defendant went to trial charged premeditated first-degree murder and aggravated kidnapping. The trial court added felony murder, instructing as follows:

"Defendant is charged with the crime of murder in the first degree. Defendant pleads not guilty. To establish this charge each of the following claims must be proved. Defendant, or someone acting in concert with him:
  I. Killed another human being, Karen Baile,
      (a) committed maliciously
      (b) willfully,
      (c) deliberately and with premeditation, or
  II. committed in the perpetration or attempt to perpetrate any felony,
III. this happened in Sedgwick County, Kansas.

"Felony Murder Rule: If the death of a human being ensues in the perpetration or attempt to perpetrate a felony dangerous to human life then murder in the first degree is committed even though the death of a human being is not intended.

"Kidnapping and aggravated kidnapping are felonies dangerous to human life."

The verdict entered did not indicate on which theory the jury relied.

In *State v. Foy*, 224 Kan. 558, 566, 582 P.2d 281 (1978), we held the fact that felony murder is not charged in the information does not preclude an instruction on felony murder where there is evidence to support the instruction.

We recently discussed the standard of appellate review in *State v. Switzer*, 244 Kan. 449, Syl. ¶ 1, 769 P.2d 645 (1989), where we said:

"Where defendant claims insufficiency of the evidence in a criminal case, an appellate court is required to review all the evidence in the light most favorable to the prosecution in determining whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt."

In the preceding issue, we set forth the evidence of aggravated kidnapping. Further, there was evidence the victim died while

under defendant's control. There was sufficient evidence to support a first-degree murder conviction under either theory.

In *State v. Wilson*, 220 Kan. 341, 345, 552 P.2d 931 (1976), we said: "When an accused is charged in one count of an information with both premeditated murder and felony murder it matters not whether some members of the jury arrive at a verdict of guilt based on proof of premeditation while others arrive at a verdict of guilt by reason of the killer's malignant purpose." We have further held that the State is not required to elect between premeditated and felony murder, as K.S.A. 21-3401 establishes the single offense of murder in the first degree, and only provides alternative methods of proving the crime. *State v. Chism*, 243 Kan. 484, 491, 759 P.2d 105 (1988); see PIK Crim. 2d 56.02-A.

We find this issue to be without merit.

### JURY MISCONDUCT

On May 11, 1988, the next-to-last-day of trial, the court was informed by defense counsel that the May 11, 1988, edition of the Wichita Eagle Beacon contained a story about the trial and John Lisi, who had been implicated the previous day by the defendant's testimony. Specifically, the article began, "A man accused by Randy Pioletti of cremating Karen Baile said he was forced at gunpoint to push Baile's lifeless and partially burned body back into the crematorium, the man's lawyer said in an article Tuesday." Defense counsel requested the jurors be questioned, stating there might be grounds for a mistrial. The trial court decided not to question the jurors and defense counsel moved for a mistrial. As the jurors were being brought into the courtroom to proceed with the trial, the bailiff informed the trial judge that there was an open newspaper in the jury room. The trial court informed the jury that any statements in the article were not to be considered as facts in the case and asked that if any of them had read the trial story in the newspaper, to notify the bailiff and they would be spoken to individually. Five responded. The trial court's questioning of each revealed that none had read the entire article and none had formed an opinion based on the article. The trial court was satisfied the jury had adhered to its oath and continued the trial, whereupon defendant renewed his motion for a mistrial.

Defendant asserts that the trial court erred in denying the mistrial, arguing that, "From the very first sentence, anyone reading the article would have gained knowledge of facts prejudicial to the defendant which were not in evidence."

The appellate standard of review of a trial court's refusal to grant a mistrial was stated in *State v. Bagby*, 231 Kan. 176, Syl. ¶ 4, 642 P.2d 993 (1982), where we said:

"Declaration of a mistrial under the provisions of K.S.A. 22-3423 is a decision largely within the discretion of the trial court, and that decision will not be set aside on appeal absent a clear showing of abuse of discretion."

In order to prove an abuse of discretion on appeal, the party claiming error must show that he was substantially prejudiced by the court's refusal to grant a mistrial. *State v. Bagby*, 231 Kan. at 179.

In *State v. Baker*, 227 Kan. 377, 382-83, 607 P.2d 61 (1980), we held that a juror's reading of newspaper articles pertaining to the trial was not grounds for reversal, new trial, or mistrial "unless the articles are of such a character that they might have resulted in prejudice to the losing party."

We found prejudice so as to warrant a mistrial in *State v. Yurk*, 230 Kan. 516, 638 P.2d 921 (1982), the only case cited by defendant for support. In *Yurk* one juror, after the trial began, read a newspaper article which recounted the defendant's prior convictions. The juror admitted being bothered by the prior convictions. When asked by the trial court whether the information would affect his judgment or impartiality, the juror answered, "To be honest, in a way it would." 230 Kan. at 520. The juror, under further questioning, said he could render an impartial decision, despite what he had read. The court overruled defendant's motion for mistrial. We reversed, finding that "the juror's later assurances that he is equal to the task, that he can lay aside his stated impressions or notions and render a verdict based solely on the evidence presented in court cannot be dispositive of the defendant's rights." 230 Kan. at 524.

Unlike *Yurk*, however, none of the jurors who saw the newspaper article were "bothered" by it or had formed an opinion based on the article. *Yurk*, therefore, is distinguishable from the case at bar.

In *State v. Malone*, 194 Kan. 563, 400 P.2d 712 (1965), the Wichita Beacon printed an article reciting the defendant's prior convictions on the day of trial when both sides rested. 194 Kan. at 570. The trial court refused to poll the jury or grant a mistrial. The trial court, instead, instructed the jury to disregard any newspaper, radio, or television stories of the trial. 194 Kan. at 571. We affirmed the trial court's refusal to grant a mistrial, stating:

"Here the defendant failed to make any prejudice appear. Actually the record presented shows that the only juror who had read the article said he could not recall what it had reported and when asked by the court if the article had influenced his verdicts he replied 'Absolutely not.' " 194 Kan. at 572.

We find no abuse of discretion in the trial court's refusal to grant a mistrial herein.

## DOUBLE JEOPARDY

Defendant next contends that, because the possibility exists that he was convicted of felony murder and aggravated kidnapping, both convictions cannot stand as they are the same offense under *Blockburger v. United States*, 284 U.S. 299, 76 L. Ed. 306, 52 S. Ct. 180 (1932).

This argument has no merit.

In *Blockburger v. United States*, 284 U.S. 299, the United States Supreme Court examined the distinctions between offenses, stating:

"Each of the offenses created requires proof of a different element. The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not. [Citation omitted.]" 284 U.S. at 304.

We applied this test most recently in *State v. Dunn*, 243 Kan. 414, 758 P.2d 718 (1988), where we set out the elements required for felony murder and aggravated kidnapping, stating:

"The constitutional prohibition against double jeopardy is directed to the identity of the offense and the act. Where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied when determining whether there are two offenses or only a single offense is whether each statutory provision requires proof of an element that the other does not. Where one statute provides proof of an element

that the other does not, the crimes are not the same, even though proof of the separate crimes may substantially overlap.

. . . .

". . . If there is evidence to support the elements of kidnapping and evidence to support that a homicide was committed during the perpetration of the kidnapping, then the offenses would not merge. Both of the felony convictions here are convictions for crimes independent of the homicides; therefore, they do not merge.

"Dunn's convictions of aggravated robbery, aggravated kidnapping, and felony murder require the State to prove an element in each offense that is not required in the other offenses. Dunn's multiple convictions for the single act or transaction are constitutionally permissible." 243 Kan. at 432-33.

*Dunn* is dispositive of this issue. Defendant's convictions of first-degree murder and aggravated kidnapping are constitutionally permissible and do not constitute double jeopardy.

## PROSECUTORIAL MISCONDUCT

Defendant claims eleven instances of alleged prosecutorial misconduct occurring during cross-examination of defendant and in closing arguments. For the most part, the complaints relative to the cross-examination are on the lines of sarcastic phrasing of questions, editorial comment on the answer, and tone of voice employed.

No contemporaneous objection was made to eight of the complained-of instances. Reversible error cannot be predicated upon a complaint of misconduct of counsel during cross-examination and closing argument where no contemporaneous objection is lodged. *State v. Walker*, 244 Kan. 275, 280, 768 P.2d 290 (1989); *State v. Bird*, 238 Kan. 160, 179-80, 708 P.2d 946 (1985); see *State v. Murdock*, 236 Kan. 146, 153, 689 P.2d 814 (1984); K.S.A. 60-404.

It is also well established that an appellate court will not find reversible error when an objection to a prosecutor's question or statement has been sustained, *State v. Murdock*, 236 Kan. at 153-54, or when the jury has been admonished to disregard the remark. *State v. Lewis*, 238 Kan. 94, 99, 708 P.2d 196 (1985). In this case, the defendant's objection to one incident was sustained. In addition, when defense counsel objected to the prosecutor's tone of voice, the court instructed the jury that

statements of lawyers are not evidence to be considered by the jury.

One final incident remains. Defendant repeatedly answered cross-examination questions with the response he could not recall the details of the night in question. At one point the prosecutor said, "Do you recall, probably not, but do you recall—?" The trial court overruled the objection to the question.

We find no reversible error on this issue as any error had little if any likelihood of having changed the result of the trial. Before concluding this issue, we believe some additional comment is appropriate. This was a lengthy trial arising from a particularly grisly murder. Emotions, understandably, ran high at the trial. However, we wish to caution the prosecutor to exercise more professional restraint in her comments and cross-examination in the future.

### SENTENCES IMPOSED

Defendant contends the trial court's sentencing of the defendant to two consecutive life terms constituted an abuse of discretion.

K.S.A. 21-4608(1) provides that separate sentences of imprisonment for different crimes imposed on a defendant on the same date shall run concurrently or consecutively as the court directs. Whether separate sentences imposed on the same day should be concurrent or consecutive is discretionary with the trial court. *State v. Strauch*, 239 Kan. 203, 219, 718 P.2d 613 (1986).

K.S.A. 21-4606 establishes factors to be considered by the court in fixing the lowest minimum term of imprisonment. The sentencing criteria in K.S.A. 21-4606 apply to a trial court's determination of the sentence to be imposed and the sentence includes whether multiple terms of imprisonment are to be served consecutively or concurrently. *State v. Strauch*, 239 Kan. 203, Syl. ¶ 8; *State v. Adkins*, 236 Kan. 259, 264, 689 P.2d 880 (1984).

A sentence imposed which is within the statutory limits will not be disturbed on appeal, provided it is within the realm of discretion on the part of the trial court and not the result of partiality or prejudice. *Baker v. State*, 243 Kan. 1, Syl. ¶ 6, 755 P.2d 493 (1988); *State v. Hamilton*, 240 Kan. 539, Syl. ¶ 1, 731 P.2d 863 (1987).

As previously stated, the facts herein were particularly grisly. There was no direct evidence as to whether the victim was alive or dead when cremated and, if alive, whether she was conscious or unconscious. In view of defendant's statements that he wanted her "to feel it" and his testimony at trial that Karen was alive and pleading for help when placed in the crematory by the man defendant said committed the crime, certain grim contemplations occur.

At sentencing the trial court stated:

"At one time, not too long ago, a sentence to be confined to the custody of the Secretary of Corrections for the rest of your natural life meant just that. By statute and enactment of the legislature, that is no longer the case. At the current time, a person could be released in a far lesser time. I have taken into account the extent of the harm done, and I have taken into account what the jury found to be the facts, that the plan articulated to several people, has been carried out, and also a distressing fact, what the young lady, the secretary, testified to, that you told her that you want her to feel it. But the principal reason for making these sentences consecutive is to make sure that a substantial period of time passes before the Parole Board, by whatever name it may be called in the future, in reviewing your case, decides."

Defendant contends this was an improper attempt by the trial court to manipulate defendant's parole eligibility date.

The trial court obviously believed, and justifiably so, that defendant's conduct warranted long-term incarceration. The language employed may have been unfortunate in some respects, but we find no abuse of discretion in the sentencing herein.

The judgment is affirmed.